485 F.2d 718
 Fed. Sec. L. Rep. P 94,162, 1973-2 Trade Cases 74,734
 PBW STOCK EXCHANGE, INC., Petitioner,
v.
SECURITIES AND EXCHANGE COMMISSION, Respondent.
EQUITY SERVICES, INC., et al., Petitioners,
v.
SECURITIES AND EXCHANGE COMMISSION, Respondent.
CONNECTICUT NUTMEG SECURITIES, INC., Petitioner,
v.
SECURITIES AND EXCHANGE COMMISSION, Respondent.
Robert I. BERDON as Treasurer of the State of Connecticut,
and President of Connecticut Nutmeg Securities,
Inc., Petitioner,
v.
SECURITIES AND EXCHANGE COMMISSION, Respondent.
 Nos. 73-1116, 73-1165, 73-1266 and 73-1267.
 United States Court of Appeals,
Third Circuit.
 Argued June 7, 1973.
Decided Sept. 28, 1973.
 
 Franklin Poul, Judith R. Cohn, Carl W. Schneider, Philadelphia, Pa., for petitioner, PBW Stock Exchange, Inc., No. 73-1116; Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., of counsel.
 Daniel J. McCauley, Jr., Blank, Rome, Klaus & Comisky, Philadelphia, Pa., Milton V. Freeman, Jeffrey D. Bauman, Arnold & Porter, Washington, D. C., for petitioners in No. 73-1165.
 Cadwalader, Wickersham & Taft, Washington, D. C., for petitioner in No. 73-1266.
 Robert K. Killian, Atty. Gen., Bernard F. McGovern, Jr., Asst. Atty. Gen., State of Connecticut, for petitioner in No. 73-1267.
 Walter P. North, Acting Gen. Counsel, David Ferber, Sol., Harvey L. Pitt, Sp. Counsel, Washington, D. C., David J. Romanski, Martin S. Berglas, Charles R. Manzoni, Jr., Washington, D. C., for respondent, Securities and Exchange Commission in No. 73-1116, No. 73-1165, No. 73-1266 and No. 73-1267.
 Before SEITZ, Chief Judge, and STALEY and ADAMS, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Chief Judge.
 
 
 1
 Petitioners here appeal directly from the promulgation of Rule 19b-2[1] by the Securities and Exchange Commission, effective January 16, 1973. Petitioners invoke the jurisdiction of this court under Sec. 25(a) of the Securities Exchange Act of 1934[2] and Sec. 10 of the Administrative Procedure Act. 15 U.S.C. Sec. 78y(a); 5 U.S.C. Secs. 702-04 (1971). The rule was not promulgated by an order of the Commission.
 
 
 2
 Rule 19b-2 was the product of many different hearings before, and studies by, the Commission. It is premised upon the basic theory that a condition attaching to membership on a public exchange is a willingness to serve the investing public. Therefore, the rule conditions future membership of both present and potential member brokerage firms upon a manifestation of such willingness. For purposes of this determination, the rule establishes a rebuttable presumption that any brokerage company is serving the public if at least 80% of its business volume is transacted for "nonaffiliated persons." Procedurally, the exchanges are required to adopt the rule as part of their individual exchange rules and by-laws.
 
 
 3
 A three-year grace period has been built into the rule. To take advantage of it, however, those currently not in compliance with the provisions of the rule must immediately adopt and begin putting into effect a plan designed to bring them into compliance within the three-year period. Each individual exchange is charged with ensuring the adoption and effectuation of a plan by its noncomplying members or itself be subject to proceedings before the Commission. 17 C.F.R. Sec. 240.19b-2(d) (1973).
 
 
 4
 Because the rule requires the regulated public exchanges to supplement or alter their rules to bring themselves into conformance with its terms, it first was presented to the national exchanges by letter. This was pursuant to procedures mandated under Sec. 19(b). However, in seeking authority to promulgate the substantive portions of this rule, the Commission relied upon Secs. 2, 6, 11, 17 and 23(a), in addition to Sec. 19(b). 15 U.S.C. Secs. 78b, 78f, 78k, 78q, 78s(b) and 78w(a) (1971). When the exchanges, for various reasons, refused to adopt the rule voluntarily, the Commission held a rulemaking proceeding under Sec. 4 of the APA. 5 U.S.C. Sec. 553 (1971). After the hearing, the rule was modified and adopted in its present form.
 
 
 5
 The rule applies to all members of all exchanges. However, the initial impact of the rule will be borne primarily by current institutional members of the various exchanges. Consequently, the rule has become known as the "institutional membership" rule. Collaterally, those exchanges which have noncomplying institutional members seemingly will be affected in the same proportion to which they have allowed such membership. On the PBW Stock Exchange, forty-three per cent of the trading volume is accounted for by institutional members which presently are not in compliance with the rule. This appears to be the high. Others, like the New York Stock Exchange (NYSE), which has not allowed institutional membership, will feel the initial impact of the rule much less.
 
 
 6
 The future impact of the rule will not be so limited. Those exchanges which have not permitted institutions to buy memberships-such as the NYSE-will be forced to allow them to do so if the brokerage affiliate of an institution complies with the rule's standards. Thus, while certain exchanges may be prevented from dealing with those whose membership they would otherwise seek, other exchanges will be forced to deal with those they have sought to exclude in the past.
 
 
 7
 Along with the four named petitioners in this action, numerous amici have filed briefs for the information of the court, including the Antitrust Division of the Department of Justice. All challenge the provisions of the rule. The three preponderant bases of attack are: (1) the hearing procedure used here did not comport with that required by both Sec. 19(b) of the Exchange Act and Secs. 4, 7, and 8 of the APA [15 U.S.C. Sec. 78s(b); 5 U.S.C. Secs. 553, 556, & 557]; (2) the SEC lacked statutory authority to promulgate this rule; and (3) the SEC did not adequately attempt to reconcile the antitrust implications of the rule with the antitrust laws. A fourth underlying theme of these briefs is that the Commission's definition of "investing public" is arbitrary. Petitioners and the amici claim it fails to recognize that many institutional investors-such as mutual funds, mutual insurance funds, and state welfare and pension funds- are actually serving a broad spectrum of the investing public even though their brokerage affiliates may only execute the parent's transactions.
 
 
 8
 Although the SEC vigorously defends its rule on the merits, it has also interposed a motion to dismiss this appeal for lack of jurisdiction. We turn to the disposition of the motion.
 
 
 9
 I. THE PROBLEM IN THE CONTEXT OF THE STATUTE.
 
 
 10
 Petitioners predicate this appeal upon both Sec. 25(a) of the Exchange Act and Sec. 10 of the APA. We note preliminarily that Sec. 10 contains no independent grant of appellate jurisdiction to the court of appeals. Rather, it merely amplifies any jurisdictional grant to this court contained in the substance of the Exchange Act. Therefore, our examination must focus upon the terms of Sec. 25(a). To provide perspective on the nature of the problem posed by this motion, and to provide a basis for our examination of the terms of Sec. 25(a), however, it is essential to first examine the provisions of Sec. 19(b).
 
 
 11
 Section 19(b) provides procedures for both voluntary and compelled adoption of Commission recommendations in specified regulatory areas. If the Commission deems a recommendation in any of these areas to be of sufficient import to warrant formal adoption by an exchange, it must send a letter to the exchange requesting it to make voluntarily the recommended alteration in its rules or by-laws. Should the exchange accede, no formal action by the Commission is required. The Commission's recommendation becomes binding upon members of that exchange because the exchange itself had adopted the rule. Once adopted, the exchange must enforce the rule or face possible disciplinary action by the Commission under Sec. 19(a) of the Act.
 
 
 12
 Should the exchange refuse to comply with the request of the Commission to adopt the recommendation, the statute provides:
 
 
 13
 The Commission is further authorized, if after making appropriate request in writing to a national securities exchange that such exchange effect on its behalf specified changes in its rules and practices, and after appropriate notice and opportunity for hearing, the Commission determines that such exchange has not made the changes so requested, and that such changes are necessary or appropriate for the protection of investors or to insure fair dealing in securities traded in upon such exchange or to insure fair administration of such exchange, by rules or regulations or by order to alter or supplement the rules of such exchange. . . .
 
 
 14
 15 U.S.C. Sec. 78s(b).
 
 
 15
 In the instant case, the Commission considered the proposal sufficiently important to direct it to all the registered securities exchanges. Various exchanges refused to comply with the Commission's rule, all for different reasons. After this refusal to comply, the statute vested in the Commission the option to effect the recommendation either by proceeding in a legislative manner- promulgation of a rule, or in an adjudicatory manner-issuance of an order. Here, the Commission chose to promulgate a rule.
 
 
 16
 The crux of the problem posed by this procedural discretion vested in the Commission under Sec. 19(b) lies in the terms of the statutory review powers granted this court under Sec. 25(a) of the Exchange Act.[3] Although the SEC has the option to proceed either by rule or regulation or by order under Sec. 19(b), Sec. 25 is not similarly broad in its grant of review jurisdiction to this court. Rather, Sec. 25(a) allows review here only when an order has been entered by the Commission. Neither any section of the Exchange Act nor of the APA vests jurisdiction in this court to review on direct appeal from the SEC rules or regulations which it has promulgated.
 
 
 17
 Despite this seeming statutory preclusion of our entertaining this appeal, petitioners steadfastly contend we have jurisdiction over this appeal. In their attempt to avoid the lack of a jurisdictional grant under the statute for direct appellate review of Commission rules, petitioners seek to show Rule 19b-2 is an order for purposes of the statute: (1) because of its substantive effect upon the business relationships between PBW and its members; and/or (2) because it was primarily aimed against one exchange, the PBW. On the former point, petitioners contend the decision of the Supreme Court in Columbia Broadcasting System v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942), and its progeny are dispositive.
 
 
 18
 To deal with these contentions, we must first examine the structure and underlying legislative history of the Exchange Act, bearing in mind the admonition of the Supreme Court that:
 
 
 19
 We must look . . . to the language of the statute, read in the light of its purposes and its legislative history, to ascertain whether the order for which review in court is provided is contrasted with forms of administrative action differently described as a purposeful means of excluding them from the review provisions.
 
 
 20
 AF of L. v. NLRB, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940).[4] After we have completed our examination of these elements, we will turn and consider the petitioners' contentions seriatim.
 
 
 21
 II. THE STRUCTURE OF THE EXCHANGE ACT.
 
 
 22
 The Exchange Act was carefully structured to give the regulatory commission which it established powers sufficiently broad that it could effectively oversee the securities industry. The main thrust of the operative provisions of the Act was toward regulation of the nation's stock exchanges and trading thereon. The Act was passed against the backdrop of the catastrophic financial reverses suffered by this country in the period 1929-33. It was designed to supplement the initial efforts to protect investors manifested in the Securities Act of 1933[5] and proscribed certain practices which had been regarded as major causes of those reverses in the securities markets. Additionally, it was left sufficiently open-ended that the regulatory agency which it established would have the power to deal with new and as yet unthought of schemes to defraud the investing public and manipulate the securities markets.
 
 
 23
 Procedurally, the Act is tailored and specific, dictating how functions delegated the Commission shall be handled. Some subsections prescribe an adjudicatory hearing with final issuance of an order; other sections mandate a rulemaking proceeding with final promulgation of either a rule or regulation. In only six subsections of the entire Act is the Commission given the option to proceed either by order or by rule or regulation. Section 19(b) is one of those subsections.[6]
 
 
 24
 Comparison of Sec. 19(a) and (b) illustrates this careful tailoring and delegation of procedural power. Section 19(a) is the subsection which provides, inter alia, for the disciplining of exchanges which do not comply with, or do not enforce, either the statute or the rules and regulations promulgated thereunder. 15 U.S.C. Sec. 78s(a) (1). In exercising its power to suspend or withdraw the registration of an exchange, the statute specifies that the Commission shall proceed only by order. Thus, exercise by the Commission of the power vested in it by Sec. 19(a) (1) would be immediately reviewable in this court under Sec. 25(a). However, Sec. (b)-which contains no grant of enforcement power against an exchange-provides that the Commission can proceed either by rule or regulation or by order. Further, it can proceed by either device even as to only one exchange under the terms of the subsection.
 
 
 25
 It is against this background that the grant of jurisdiction in Sec. 25(a) must be examined. As with most sections of the Act, it is specific in the type of Commission action over which it allows direct appellate review in the court of appeals: it grants this court only the power to directly review orders of the Commission. Was the exclusion of rules or regulations promulgated by the Commission a deliberate omission? The answer is found in a review of the legislative history of the Act.
 
 
 26
 III. THE LEGISLATIVE HISTORY OF THE EXCHANGE ACT.
 
 
 27
 Examination of the Congressional history reveals that the omission of rules or regulations from the terms of Sec. 25(a) was no mere oversight on the part of Congress. Rather, it was part of their specific intendment in drafting this legislation. This is most clearly revealed in the House floor debates on H.R. 9323 [73d Cong., 2d Sess.], the bill which eventually became the Securities Exchange Act of 1934.
 
 
 28
 Although Sec. 19(b) was then numbered Sec. 18(b), the procedural portion of the subsection was practically identical to its current form. The one difference of any notice is that the section at that point specified that the Commission would carry out its duties under Sec. 19(b) only by rule or regulation.
 
 
 29
 Particularly relevant to our inquiry are the floor debates surrounding the proposed amendment of Rep. Fish of New York to delete the phrase "by rules or regulations" and substitute in the phrase "by order." Rep. Fish stated the purpose of his amendment was to "permit recourse to the courts by the exchange [affected by Commission action], whereas under 'rules or regulations,' the . . . Commission can do about anything it wants to the exchange and its members . . . without the exchange having any recourse whatever to the courts." 78 Cong.Rec. 8087 (5/4/34).
 
 
 30
 A supporter of the Fish amendment, Rep. Wadsworth, in seeking support for the amendment, clearly defined the purpose of the amendment:
 
 
 31
 [U]nder this section [as presently drafted], there is no recourse to the court. The final regulation of the Commission cannot be appealed from, and the amendment offered by the gentleman from New York [Mr. Fish] is merely for the purpose of allowing an exchange, in case of an extreme ruling which threatens to injure its legitimate business and the business of buying and selling securities all over the country, the right to appeal.
 
 
 
 * * *There are several other instances . . . in which the Commission may, "by order", suspend or put into effect its regulations. The use of the phrase "by order" automatically gives a person or an exchange thus to be regulated the right to appeal.
 
 
 [78]
 Cong.Rec. 8092 (5/4/34). Rep. Wadsworth contended the Fish amendment additionally would make Sec. (b) consistent with Sec. (a), in which it was specified that the Commission would proceed only by "order." Id
 Opponents of the proposed amendment, who eventually won out, replied that indeed, it was the express intention of the section as drafted to preclude direct appellate review of rules or regulations promulgated by the Commission under Sec. 19(b). Rep. Snell, in response to Rep. Fish stated:
 The proposal here is whether there shall be an appeal from the action of the Commission requiring a change in the rules of an exchange.
 The section provides that an interested exchange be given the right to a hearing, and after the hearing the Commission by rules and regulations determines whether or not the change in rules shall be made. The practical question is whether or not the exchange shall be given an appeal to a court of law from the ruling of the Commission.
 It is important that we shall not give the exchanges the right to appeal and go into court from the action of the Commission in making the rules and regulations. It would subject the Commission to endless harassment.
 
 
 
 32
 * * *
 
 
 33
 When we give the Commission the right, by rules and regulations to require that an exchange shall have a certain rule governing its functions, that is a quasi-legislative power of Congress. The Commission acts for Congress in establishing such rule or regulation. No one living ever heard of a claim that an interested party should have the right to restrain the action of Congress in passing laws to regulate the affairs of our country.
 
 
 34
 78 Cong.Rec. 8090-91.
 
 
 35
 Similarly, Congress did not mean to make direct appellate review available under Sec. 25 by requiring rules and regulations to be promulgated by order. Rep. Rayburn, the floor manager of the bill, made this clear in opposing Rep. Fish's amendment. He stated:
 
 
 36
 In my opinion, we have a good bill, a fine, reasonable, sane bill; but if we adopt the amendment offered by the gentleman from New York [Mr. Fish], we shall defeat practically everything we have done in the preceding 40 pages.
 
 
 37
 . . . If you are going to say that the Commission may do this by rules and regulations, that is one thing. If you are going to say that the Commission shall formulate rules and regulations and issue them in the form of orders, that is another thing; and every one of them could be tied up in the courts from 12 to 24 months and thus absolutely negative the very things we have done in the preceding forty-odd pages of this bill.
 
 
 38
 In my opinion, the question involved in the Fish amendment is whether or not after writing a law you are going to give the administrative body the power to make the law effective and the power to enforce it.
 
 
 39
 78 Cong.Rec. 8093.
 
 
 40
 By later compromise in the Senate-House conference, the option to proceed either by rule or regulation or by order was granted the Commission. However, that in no way vitiated the Congressional feeling as to the insulation from review under Sec. 25(a) enjoyed by a rule or regulation promulgated by the Commission.
 
 
 41
 Reinforcement on this point is provided in the legislative hearings on Sec. 25(a) before the Senate Committee on Banking and Commerce. The New York Stock Exchange proposed redrafting Sec. 25(a) (Sec. 24(a) in the bill) so as to give standing to appeal under that section to any party aggrieved by a rule or regulation of the Commission, as well as by an order. The NYSE contended that otherwise, rules or regulations of the Commission would be totally insulated from judicial review.
 
 
 42
 The committee rejected this change. Senator Barkley, in discussing the proposed change with the NYSE representative, made clear that avenues of review were open. For example, parties who did not wish to comply with the SEC rule could wait for enforcement proceedings to be instituted, and then challenge them in that proceeding. However, the dialogues make clear that although some might feel directly aggrieved by the application of the rule or regulation promulgated by the Commission, appeal under Sec. 25(a) to the court of appeals would not lie. See Hearings on S.Res. 84, S.Res. 56, & S.Res. 97 before Senate Committee on Banking & Currency, 72d Cong., 2d Sess., and 73d Cong., 1st & 2d Sess., at 7568-7572 (1934). In fact, the committee expressly foresaw the type of situation arising where, as here, a party might be equally aggrieved whether the Commission acted by rule or regulation or by order. Even with such recognition, however, they refused to change the provisions of Sec. 25(a).
 
 
 43
 The worry repeatedly expressed by Congress in these attempts to subject rules and regulations of the Commission to review under Sec. 25(a) was that courts would be substituting their judgment for that of the Commission. While it was recognized that judicial review of some nature of Commission rules or regulations would be possible, particularly on the questions of whether they were constitutional or within the statutory authority of the Commission,[7] Congress did not intend to make Sec. 25(a) the vehicle for such review.
 
 
 44
 Examination of Sec. 25(a) reveals the reason for the Congressional reservations. That section allows the court of appeals, in reviewing a final order entered by the Commission, "to affirm, modify, and enforce or set aside such order, in whole or in part." Further, if the court finds the record deficient, it can remand to the Commission for the taking of further evidence. Thus, under the drafting of Sec. 25(a), the court of appeals, in reviewing Commission orders, has considerable discretion as to the terms under which it will enforce that order.[8] Congress did not want such a substitution of the court's view for that of the Commission on legislative policy matters.
 
 
 45
 At the time of the enactment of the Exchange Act, there was neither the APA nor the Declaratory Judgment Act. Thus, as to legislation, no preenforcement declaratory review was available. However, judicial review of federal legislation was always available, even if only in the enforcement proceeding itself; parties could challenge the constitutionality of an act or the regularity of its enactment. Consequently, when Congress stated that it intended to insulate rules and regulations of the Commission to the same degree that acts of Congress were insulated from judicial review, it was circumscribing very closely the limits of judicial cognizance of quasi-legislative action by the Commission.[9] Allowing judicial review of the type established under Sec. 25(a) of Commission rules and regulations was totally incompatible with the legislative powers delegated to the Commission and which Congress intended to be shared by the Commission only with Congress itself.
 
 
 46
 Despite the bulk and substance of the legislative history of the Exchange Act against their position, petitioners take solace from an isolated remark of Rep. Rayburn concerning the availability of appeal from Commission rules or regulations whose promulgation "exceeded its jurisdiction and its authority under the act." 78 Cong.Rec. 8091. However, his later amplification of this remark makes clear he was referring to the limited right to challenge the rule or regulation as one would challenge an act of Congress. 78 Cong.Rec. 8093. Although petitioners would have us equate the word "appeal" with the right to appeal under Sec. 25(a), it is clear from the whole of the history that the appeal which he was referring to in that context was appeal to the courts for judicial review of the statutory or constitutional basis of an action. As with Congressional action, such "appeal" would only lie in an enforcement proceeding or, as postulated by Senator Barkley, after a secondary consideration of the matter as to a particular party by the SEC.
 
 
 47
 Finally, it is worth noting that Congressional statements about the intention to insulate SEC quasi-legislative action from judicial review was even more imperative at the time than such statements would be considered today. That was because of the aforementioned lack of available alternatives-such as the APA and the Declaratory Judgment Act -for seeking judicial review of congressional or quasi-legislative action.
 
 
 48
 Thus, an examination of the legislative history reveals a clear and unequivocal intention to insulate Commission rules or regulations from review under Sec. 25(a). Having the benefit of this history, we can now turn to relevant Supreme Court decisions to determine whether intervening precedent has modified the impact of the legislative history as it relates to the question of Sec. 25 review of Commission rules and regulations.
 
 
 49
 IV. APPLICABLE SUPREME COURT PRECEDENT.
 
 
 50
 We believe the starting point for our discussion must be AF of L v. NLRB, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940). There, the Court was faced with a petition by the AF of L and its affiliated unions seeking review of a Board certification of the CIO-affiliated union as bargaining representative for the West Coast Longshoremen. Petitioners contended that the certification was a "final order" of the Board, that they were aggrieved by the "final order," and that the certification, effectively determining the bargaining representative for an entire region, was beyond the Board's power.
 
 
 51
 Petitioners predicated their petition for review upon Sec. 10(f) of the NLRA (Wagner Act). 29 U.S.C. Sec. 160(f). That section provides for direct appellate review of final orders in the court of appeals by any aggrieved party. Petitioners contended the certification was a final order for purposes of review under Sec. 10(f). However, certification was nowhere spoken of as an order of the Board. Thus, the Court was required to ascertain whether these certifications of bargaining representatives by the Board were "final orders" for purposes of the statute. 308 U.S. at 408, 60 S.Ct. 300.
 
 
 52
 In examining the statutory history, the Court noted that the predecessor statute to the Wagner Act had allowed for review of the predecessor Board's certifications of bargaining representatives; in that statute, they had been denominated "orders of certification." By the time of the debates on the Wagner Act, some experience under the prior act had been gained. As to the provisions allowing review of these "orders of certification," Congress noted, with strong disapproval, that review of these orders had caused significant problems in gaining prompt compliance with the dictates of both the act and the Board. Resultantly, Congress deleted the phrase "orders of certification" in the Wagner Act and substituted only the word "certification." With this history, the Court, in holding the certifications of the Board under the Wagner Act immune from direct appellate review under the terms of Sec. 10(f), stated:
 
 
 53
 Here it is evident that the entire structure of the Act emphasizes for purposes of review, the distinction between an "order" of the Board restraining an unfair labor practice [reviewable under Sec. 10(f)] and a certification in representation proceedings. . . . [Certification], authorized by Sec. 9, is nowhere spoken of as an order, and no procedure is prescribed for its review apart from an order prohibiting an unfair labor practice. . . . The statute on its face thus indicates a purpose to limit the review afforded by Sec. 10 to orders of the Board prohibiting unfair labor practices, a purpose and construction which the legislative history confirms.
 
 
 54
 . . . [I]n considering the provisions of Sec. 9(d) the committee reports were emphatic in their declaration that the provisions of the bill do not extend to Sec. 9 except as incidental to review of an order restraining an unfair labor practice under Sec. 10. . . . The conclusion is unavoidable that Congress, as the result of a deliberate choice of conflicting policies, has excluded representation certifications of the Board from review by federal appellate courts authorized by the Wagner Act. . . .
 
 
 55
 308 U.S. at 409-411, 60 S.Ct. at 304-305 [footnotes omitted].
 
 
 56
 The relevance of the decision in AF of L is immediate and compelling. As in the legislative history of the statute the Court there examined, Congress here made it unequivocally clear that it did not intend rules or regulations promulgated by the Commission to be subject to direct appellate review. Amendments to both Secs. 19(b) and 25(a) were proposed to accomplish the very result which petitioners here seek, and those amendments were rejected. And the language used by the floor manager of the bill-Rep. Rayburn-was no less emphatic in the instant case as to an intent to preclude judicial review under Sec. 25(a) of Commission rules and regulations than was the Congressional history in the AF of L case.
 
 
 57
 Petitioners contend, however, that the opinion of the Supreme Court in Columbia Broadcasting System v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L. Ed. 1563 (1942), made Commission rules and regulations subject to review under Sec. 25(a) despite the statutory language and Congressional history to the contrary. They maintain the Court in the Columbia Broadcasting decision eliminated distinctions between orders and rules and regulations for purposes of review under the Exchange Act. Thus, they argue, the determinative factor for predicating review jurisdiction under Sec. 25(a) is not whether the action is in form an order, but rather, what is the impact of the SEC's action upon the regulated parties.
 
 
 58
 In Columbia Broadcasting, the Court was confronted with a challenge to an order of the Federal Communications Commission promulgating the "Chain Broadcasting Regulations." The effect of those regulations was to annul the provisions of the network's contracts with its affiliates and to outlaw its previous method of conducting business. The regulations effectively stated that any station which complied with the terms of its network contract would have its license denied at renewal time. Thus, the regulations operated to terminate the entire contractual basis on which the petitioner had built its business.
 
 
 59
 Section 402 of the Communications Act of 1934 [47 U.S.C. Sec. 402] governed the reviewability of Commission orders and procedures to be used in obtaining such review. Under Sec. 402(a), all orders of the Commission were subject to challenge, except those specified in Sec. 402(b). This latter section enumerated certain orders which were to be reviewed exclusively by direct appeal to the Court of Appeals for the District of Columbia Circuit. Orders subject to review under Sec. (b) only involved exercise by the Commission of its quasi-adjudicatory powers. For example, a denial of a license was subject to review under Sec. (b).
 
 
 60
 Section 402(a) at the time of the Columbia Broadcasting decision, unlike Sec. (b), bore little procedural semblance to its modern-day counterpart. Rather, Congress had incorporated the provisions of the Urgent Deficiencies Act, 38 Stat. 219,[10] into the section. This latter act had been passed in 1913 and established procedures for review of orders of the Interstate Commerce Commission. During the intervening twenty-one years between its original passage and its engraftment onto the Communications Act of 1934, a significant body of law had been compiled under the UDA. For present purposes, one of the most important propositions which had been established was on the scope of review jurisdiction of ICC orders under the UDA. It had been held they could be reviewed under its provisions whether they involved "the quasi judicial function of determining controversies or . . . the delegated legislative function of rate making and rule making." United States v. Los Angeles & S.L. R.R., 273 U.S. 299, 309, 47 S.Ct. 413, 414, 71 L.Ed. 651 (1927). This entire structure was effectively incorporated into Sec. 402(a) at the time of its passage.
 
 
 61
 Although orders effecting exercise of delegated legislative power by a regulatory agency subject to the UDA had been held reviewable thereunder, the availability of such review had not been without qualification. Rather, the court, in resolving the appealability issue, had to examine the substance of the orders. This examination focused upon whether the orders were "affirmative" or "negative": whether they ordered someone to do something or granted the requested relief; or whether they denied the requested relief. A third group had the characteristics of neither, i. e., an order assigning a case for hearing. Orders of the first category had been held subject to review under the UDA, while those of the last category had been held not so subject. See, e. g., Chicago Junction Cases, 264 U.S. 258, 263-264, 44 S. Ct. 317, 68 L.Ed. 667 (1924). Negative orders had been held subject to review only where certain criteria were met. See, e. g., Rochester Telephone Corp. v. United States, 307 U.S. 125, 131-132, 59 S.Ct. 754, 83 L.Ed. 1147 (1939).[11]
 
 
 62
 To make the determination of whether the order was of the type subject to review, courts looked beyond the mere form in which the order was couched to determine the substantive effects upon the parties. For purposes of the UDA, it made no difference whether the substantive effect was created by the agency's exercise of its adjudicatory or quasi-legislative function. In Powell v. United States, 300 U.S. 276, 57 S.Ct. 470, 81 L.Ed. 643 (1937)-one of the jurisdictional cases primarily relied upon by the Supreme Court in Columbia Broadcasting,[12] the Court grappled with the parameters of the problem in weighing the Government's contention that the form of the order determined reviewability under the UDA. The order involved revoked a tariff which had been filed by a railroad; the impetus for the ICC's action had been a complaint filed by a competing railroad. The Government contended that the order neither named any party nor compelled any action. Rather, it contended, it was merely a record of the ICC's action revoking the tariff and was, therefore, nonreviewable under the UDA. The Court disagreed, stating:
 
 
 63
 But overemphasis upon the mere form of the order may not be permitted to obscure its purpose and effect . . . . In effect, the order grants the [requested] relief sought by the Central's complaint. . . . Interpreted according to its purposes, the order is in substance an affirmative one and therefore reviewable under the statute.
 
 
 64
 300 U.S. at 285, 57 S.Ct. at 475 [emphasis supplied; citations omitted].
 
 
 65
 As in Powell, the Government in Columbia Broadcasting contended the FCC's order promulgating the regulations was not subject to review under Sec. 402(a). It argued that since the order was not directed against any particular person, penalized no past conduct, and merely established future guidelines for the renewal of radio licenses by the FCC, the order was not the type of order reviewable under Sec. 402(a).
 
 
 66
 Against the background of the mass of precedent arising under the UDA as to amenability of agency orders to review under its provisions, the Court rejected the Government's arguments. It stated the "label" put upon an order by the FCC was not decisive for purposes of review under the statute. Rather, the order had to be examined to determine its net impact upon the regulated parties, as mandated in Powell. Then the order had to be examined to determine whether it was the type of order for which review was intended under the statute, as mandated in AF of L v. NLRB. The carry-through or these central concepts into the Columbia Broadcasting decision is reflected in the Court's conclusion predicating reviewability that: (1) the order (2) promulgates regulations which operate to control contractual relationships of the regulated parties; (3) even though not directed against any particular party, (4) it determines rights generally and (5) is therefore reviewable under the UDA. 316 U.S. at 417, 62 S. Ct. 1194.
 
 
 67
 Petitioners here contend, however, the fact that review of an FCC order was involved in Columbia Broadcasting was inconsequential to the Court's resolution of the jurisdictional issue there presented. They point to repeated statements by the Court that because these regulations, issued by the Commission in the avowed exercise of its quasilegislative powers, had a substantial impact upon the business affairs of the petitioner, they were subject to review under Sec. 402(a). Thus, they contend, the operative factor determining reviewability is not the form of the administrative action; rather, it is the substantive effect of the agency's action upon the regulated parties.
 
 
 68
 First, the Court in Columbia Broadcasting was not faced with the question of whether quasi-legislative actions of the agency per se were subject to review under the UDA. It had long been a settled doctrine that orders of those agencies subject to review under the UDA, e. g., the ICC, could be reviewed whether they involved a quasi-judicial or -legislative exercise of that agency's powers. The crucial factor for jurisdictional purposes was the substantive effect upon the parties.
 
 
 69
 Second, whereas orders of the FCC involving the exercise of certain of its quasi-adjudicatory powers could be reviewed only under Sec. 402(b), quasi-legislative orders of the Commission, if they were subject to immediate appellate review at all, were so subject only under Sec. 402(a). The Government interposed an argument that the proper procedure for obtaining review of the FCC's action was under Sec. 402(b), the subsection specifically intended only for clearly adjudicatory orders of the Commission.
 
 
 70
 The Court rejected the Government's contention. The Court emphasized the Commission had chosen to exercise its delegated legislative powers to implement the challenged guidelines. Consequently, the Court would not entertain an argument that the petitioners be relegated to judicial review under Sec. 402(b), or otherwise, which would be the proper procedure for reviewing the Commission's actions had it acted by adjudicatory order. Rather, because the Commission's order was a quasi-legislative exercise of its delegated powers, the only proper method of reviewing that order lay exclusively under Sec. 402(a). And because of its impact upon the parties, the order was of the type reviewable under the UDA. 316 U.S. at 421-422, 62 S.Ct. 1194.
 
 
 71
 Thus, in Columbia Broadcasting the Court was faced with the contention that a clearly quasi-legislative exercise of power should be subjected to review under the provisions set up exclusively for review of adjudicatory orders of the FCC. Although the contention was pressed there to defeat the Court's exercise of its jurisdiction while petitioners press the argument upon us here in their attempt to invoke our jurisdiction, the mandate of the Court is still directly applicable to the instant case: the contention must be rejected.
 
 
 72
 Finally, although the Court in Columbia Broadcasting talked of the impact of the regulations upon the parties and the use by the Commission of its rule-making power, the Court made clear it was not concerned with the reviewability of the regulations qua regulations. Rather, the regulations and their impact upon the regulated industry were relevant only because they constituted the substance of the order under review. The substance of the order had to be analyzed to determine whether it was an affirmative order or the type of negative order subject to review under the UDA -in which case, the Court had jurisdiction to review the order under Sec. 402(a) -or whether it was an unreviewable order under the precedent attaching under the UDA. Resultantly, the terms and effects of the regulations had to be scrutinized. In this regard, the Court stated:
 
 
 73
 Such regulations have the force of law before their sanctions are invoked as well as after. When, as here, they are promulgated by order of the Commission and the expected conformity to them causes injury cognizable by a court of equity, they are appropriately the subject of attack under the provisions of Sec. 402(a) and the Urgent Deficiencies Act.
 
 
 
 * * *
 The purposes sought to be accomplished by Sec. 402(a) and the Urgent Deficiencies Act would be defeated if a suitor were unable to resort to them to avoid reasonably anticipated injury resulting from such legal consequences of the Commission's order, merely because the Commission as yet had neither refused to renew a license, as the regulations require, nor cancelled a license, as the regulations permit. Such an argument addressed to the form rather than the substance of the order was rejected in Powell . . . .
 316 U.S. at 418-419, 62 S.Ct. at 1201 [emphasis supplied; citations omitted].
 Thus, following the mandate of earlier cases, the Supreme Court analyzed the review provisions of the statute, as well as the obvious understanding by Congress[13] of what incorporation of the UDA into the review provisions of the Communications Act meant. Next, it compared the types of actions under the two review subsections of the statute to determine which was applicable. Finally, it concluded because of the terms of the order promulgating the regulations, that it was the intendment of the statute to subject such orders to review under Sec. 402(a). In fact, it concluded that by not allowing judicial review of the challenged order, it would actually be defeating the design of the Communications Act and, inter alia, the UDA, as drafted.
 Consequently, we are compelled to reject petitioners' contention that the Court's decision in Columbia Broadcasting requires this court to assume jurisdiction over this appeal under Sec. 25(a). On the contrary, we believe the Court's deference to statutory design and intention reinforces our conclusion that in fact no jurisdiction lies in this court under Sec. 25(a) to undertake direct appellate review of Rule 19b-2.[14]
 We find the progeny of Columbia Broadcasting, also cited to us by petitioners, to be similarly distinguishable. The first, United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081, involved another set of FCC regulations promulgated by order of the Commission. Although Sec. 402(a) had been changed procedurally to its present form, the Court found the decision in Columbia Broadcasting controlling on the substantive question of whether the order was subject to review under the terms of Sec. 402(a). As before, the decisive factor for purposes of determining reviewability of the order promulgating the regulations was the impact of those regulations upon the parties. However, as with Columbia Broadcasting, examination of the regulations was relevant only to ascertaining the effect of the order for purposes of review. Thus again, the Court was not faced with the question of the reviewability of regulations qua regulations nor of a statutory design precluding certain types of review of specified agency actions.
 The second case is equally uncompelling. Frozen Foods Express v. United States, 351 U.S. 40, 76 S.Ct. 569, 100 L. Ed. 910 (1956). That decision merely involved the reviewability under the UDA of an ICC order promulgating regulations. Therefore, it involved the same jurisdictional issue discussed and settled in Columbia Broadcasting and its predecessors. Resultantly, it advances petitioners' case no further than did these previous cases.
 The final case urged as mandating our exercise of jurisdiction under Sec. 25(a) which merits our consideration is Florida East Coast Railway v. United States, 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973). Jurisdictionally, the case was in the same posture as that involved in Columbia Broadcasting, Frozen Foods Express, and Storer Broadcasting, and is therefore equally unavailing to petitioners. However, we note in that opinion a continuing admonition that courts pay the legislative history and intendment of a statute great deference in determining the scope of that statute and the specific burdens delegated thereunder.
 Thus, our examination of the authority cited to us by petitioners convinces us that not only have the dictates of the Supreme Court of AF of L v. NLRB not been questioned, but in fact they have been reiterated again and again, even in the cases cited to us by petitioners. The thrust of each of them is that courts should carefully scrutinize the statute and its history to determine the intendment of Congress as manifested in the terms of the statute. Such an examination convinces us that Congress intended to withhold the type of review here sought by petitioners. We conclude this court has no jurisdiction under Sec. 25(a) to review on direct appeal rules and regulations promulgated by the Commission. Therefore, we reject petitioners' contention that jurisdiction lies in this court under Sec. 25(a) to review Rule 19b-2 because of its substantive impact upon their business relationships.
 V. THE PERMISSIBLE SCOPE OF COMMISSION RULES AND REGULATIONS.
 In the alternative, petitioners contend that even if Rule 19b-2 is not constructively an order-and therefore reviewable as such under Sec. 25(a)-because of its impact upon the regulated parties as a whole, it is constructively an order because of the singular nature of its impact. The major premise of petitioners' syllogism is that agency action directed against a single regulated party is in substance an order. Their minor premise is that this rule is directed solely against the membership practices of the PBW. Therefore, they conclude, Rule 19b-2 is an order. Since this court has jurisdiction under Sec. 25(a) to review orders of the Commission, Rule 19b-2 is properly subject to Sec. 25 review.
 Initially, we note that Sec. 19(b) gives the Commission the power to proceed against a single exchange by rule or regulation or by order. The courts have consistently held that where an agency, as in this case, is given an option to proceed by rulemaking or by individual adjudication the choice is one that lies in the informed discretion of the administrative agency. N.L.R.B. v. Wyman-Gordon Co., 394 U.S. 759, 772, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (concurring opinion); S.E.C. v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). This proposition is not altered by the fact that the resultant rule may be directly applicable to specific individuals or situations when it has enough other characteristics of a rule. Section 2(c) of the Administrative Procedure Act, 5 U.S.C. Sec. 551(4) (1970), explicitly recognizes this policy in its definition of a rule as any "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy" (emphasis added). See 1 K. Davis, Administrative Law Treatise, Sec. 5.02 (1958). However, significant evidence exists that the rule in fact was not directed solely against the PBW. Although the PBW has perhaps been a leader in seeking the membership of certain types of institutional investors whose membership other exchanges have excluded, all exchanges have had rules prohibiting certain types of institutional membership. Now, however, all exchanges will have to bring their rules into compliance with Rule 19b-2. Thus, whereas the PBW may be forced to not solicit certain types of firms whose membership it might otherwise desire, all exchanges, including the PBW, may be forced to deal with companies as members in the future whose membership in the past they have excluded. Because of this, as oral argument developed, certain exchanges which originally supported adoption of the rule have had second thoughts about its implementation when they have realized the latent manifestations of its application to them.
 While no attempt precisely to define rulemaking can be wholly successful, the essence of its meaning is generally understood. Rulemaking by an agency, characteristically involves the promulgation of concrete proposals, declaring generally applicable policies binding upon the affected public generally, but not adjudicating the rights and obligations of the parties before it. See 1 K. Davis, Administrative Law Treatise, Sec. 5.01 (1958). Furthermore, rules ordinarily look to the future and are applied prospectively only, whereas orders are directed retrospectively, typically applying law and policy to past facts. Given these general guidelines. Rule 19b-2 is most easily classified as the product of a rulemaking rather than an adjudicatory proceeding. The rule applies to all members of all exchanges, not just to PBW and its members. Further, it provides specific standards to regulate the future membership practices of the exchanges rather than focusing on the past practices of any particular exchange. Thus, on its face, Rule 19b-2 appears to be a rule of prospective application and applicable across the board, although the rule may affect each of the exchanges to differing degrees. Cf. Florida East Coast Railway v. United States, 410 U.S. 245-246, 93 S.Ct. 810.
 In saying this, we do not mean to imply that even were this rule directed solely against the PBW, we would thereby have power under Sec. 25(a) to subject the rule or regulation to direct appellate review. Congress gave the Commission the power to proceed against a single exchange by rule or by order.[15] Further, as in the instant case, whether or not the rule is so directed may be open to considerable dispute. Such questions are better resolved by a forum whose function is fact-finding, a function which the court of appeals in the first instance is singularly ill-equipped to perform.
 As to the question of whether a rule can be constitutionally aimed against a single exchange, and whether due process mandates have been complied with in making the rule against the exchange, Congress made clear that such questions were not immune from judicial review. However, as we earlier stated, the availability of judicial review is not to be equated exclusively with the jurisdictional grant to this court under Sec. 25(a).
 Therefore, like the petitioners' first contention, we find the petitioners' second contention insufficiently founded in law to warrant this court's assumption of jurisdiction under Sec. 25(a).
 VI. CONCLUSION.
 Our review of the statute and its legislative history convinces us that Congress intended to insulate rules or regulations promulgated by the Commission under Sec. 19(b) from direct appellate review in this court under Sec. 25(a) of the Exchange Act. Further, we conclude that applicable Supreme Court precedent binds us to giving full effect to the Congressional preclusionary intendment. We reject petitioners' contentions that Supreme Court decisions subsequent to the passage of this legislation nullified, or even diluted, distinctions between Commission rules and orders for purposes of direct appellate review, in derogation of the statutory design. Finally, we cannot accept without any fact-finding that as a matter of law, this rule was aimed solely against the PBW. Nor can we, at this juncture, even conclude that were this so, this court would thereby acquire jurisdiction under Sec. 25(a).
 Therefore, we believe the motion of the SEC to dismiss this appeal for lack of jurisdiction under Sec. 25(a) of the Exchange Act, or any other applicable statute, must be granted. We emphasize that in so doing, we express no opinion on the merits. Nor, we reiterate, do we mean any statement concerning the availability of direct appellate review in this court under Sec. 25(a) to reflect adversely on the availability of other forms of judicial review, including preenforcement relief under the Declaratory Judgment Act and Sec. 10 of the APA.
 The motion of the Securities and Exchange Commission to dismiss these petitions for lack of jurisdiction will be granted.
 ADAMS, Circuit Judge (dissenting):
 The controversy now before us had its genesis in the concern of the Securities and Exchange Commission (Commission) regarding the effect on the securities industry of the "institutional investor."[1] An "institutional investor" is, typically, an insurance company, a pension fund, a foundation, or a mutual fund. In recent years, the increase of institutional involvement in the stock markets has, the Commission believes, led to an erosion of the public's ability and willingness to invest in equity securities. One remedy decided upon by the Commission has been the creation of a "single central market system for listed securities." An essential first step in the implementation of such an arrangement, it is thought, is assuring that exchange membership be used primarily for "public purposes."[2]
 Against this backdrop, and with these goals in view, the Commission took the action complained of here. Specifically, on January 16, 1973, the Commission promulgated its Rule 19b-2,[3] relying upon authority purportedly conferred by the Securities Exchange Act of 1934.[4] Entitled "Utilization of Exchange Memberships for Public Purposes," the Rule restricts membership on registered securities exchanges to those who transact at least eighty per cent of their brokerage business on such exchanges "for or with persons other than affiliated persons." Thus, for example, if an insurance company had a subsidiary with a seat on an exchange, which did eighty per cent of its business on behalf of the insurance company, the subsidiary would be disqualified from exchange membership. Stated otherwise, the Rule effectively prohibits "institutional membership" on securities exchanges.[5]
 Invoking the jurisdiction they believe is afforded this Court by section 25(a) of the Exchange Act, 15 U.S.C. Sec. 78y(a), petitioners sought review here of the Commission's proscription of institutional membership.
 Their petition challenged the Commission's power under the Exchange Act to adopt the Rule, claimed that the procedures attending the Rule's formulation violated petitioners' constitutional rights, and charged that the Rule's effect upon competitive conditions in the securities industry transgressed the antitrust laws.
 Inasmuch as the terms of section 25(a) provide for review by this Court of "order[s] issued by the Commission," the majority asserts that we are without jurisdiction to review what has been denominated by the Commission as a "rule" and not an "order." For the reasons to be discussed below, I cannot join in such a restrictive reading of section 25(a). The substance of the Commission's action-not merely the label affixed to it by the Commission itself- should, in my judgment, determine whether jurisdiction to review that action lies in this Court under section 25(a).[6]
 This is no desiccated academic discussion, for the Commission's action, that petitioner's seek to have reviewed here, will, if sustained, have a far-reaching impact upon the economic interests of the New York exchange, the regional exchanges, and particularly of these petitioners. Thus, I believe we should proceed to the merits of their contentions, notwithstanding that no formal "order" is before us. Accordingly, I respectfully dissent.
 I.
 The PBW Stock Exchange, Inc., a petitioner here, is one of twelve national securities exchanges registered with the Commission pursuant to section 6(a) of the Exchange Act. In 1968 PBW began active solicitation of "institutional" members.[7] At the time this case was brought, the Exchange had gained 38 institutional members, which provided some 40 per cent of its revenues. Those members have committed approximately 50 million dollars in capital to the Exchange, and have "contributed to the viability of PBW as a competitive market place."[8] PBW is apparently the only registered exchange so heavily dependent upon institutional membership.[9]
 Petitioner Equity Services, Inc. is a registered broker-dealer, and has been a member of PBW since February of 1972. Equity is a subsidiary of the National Life Insurance Company of Vermont, and executes portfolio transactions on the Exchange for both the general account of National Life and for three mutual funds sponsored by National Life.
 Penn Mutual Securities Corporation, another petitioner, is a wholly-owned subsidiary of the Penn Mutual Life Insurance Company. A registered broker-dealer, it has been a member of the PBW Stock Exchange since June of 1972, and its business consists entirely of the execution of portfolio transactions for its parent.
 Petitioner Guardian Advisers, Inc., also a registered broker-dealer, is a wholly-owned subsidiary of the Guardian Life Insurance Company of America. It executes portfolio transactions for the general account of Guardian Life, for a mutual fund sponsored by Guardian, and for another affiliate of Guardian.
 Petitioner Connecticut Nutmeg Securities, Inc., a registered broker-dealer organized to execute exchange transactions for the State of Connecticut's pension and trust funds, has been a member of PBW since December of 1972. Eighty-two per cent of its stock is owned by Connecticut Mutual Equity Fund, a consortium of several state pension, environmental, and welfare funds. The remaining eighteen per cent of its stock is owned by the Office of the Treasurer of the State of Connecticut. Petitioner Robert I. Berdon, the Treasurer and Chief Financial Officer of Connecticut, is the president of Nutmeg.
 Much of PBW's growth over the last few years is attributable to the presence on the exchange of institutional members.[10] The investing institutions now bring their trading orders directly to the exchange floor through the medium of their broker-affiliates, rather than through the less-direct-channel afforded by non-affiliated brokerage houses. This process has resulted in an increasing number of exchange floor transactions, benefiting both the institutions and the independent traders seeking execution of orders.[11] Too, institutional membership has given rise to an increased flow of "reciprocal" orders, that is, of small orders placed with the broker-affiliate for execution in Philadelphia, and given in return for a large institutional order sent for execution to an independent broker on the New York Exchange.[12]
 The existence of institutional members has fostered a sizeable influx of capital into PBW and the securities industry generally. Unlike many brokerdealers who apparently devote much capital to a wide range of other investment activities, PBW's institutional members dedicate substantially all their capital to their activities as brokers or dealers in publicly-traded securities.[13] The added infusion of funds that would result from the continued solicitation of institutional members would furnish a needed palliative to what is recognized as an undercapitalized industry.[14] To date, the capital flow generated by institutional membership has been of particular benefit to PBW, which competes actively for business and capital with the New York and American Exchanges.
 Viewed from the perspective of the institutional investors and their broker-affiliates, the ability to acquire and maintain membership on registered exchanges produces substantial economic benefits. Without a broker-affiliate, an institution desirous of executing an order on an exchange must, of course, work through the medium of an independent, non-affiliated exchange member. The brokerage services of non-affiliated exchange members of course are not dispensed gratuitously, and the institutions pays a commission for the execution of its order. Inasmuch as institutions customarily undertake trades involving millions of dollars, the amount paid in commissions is not small. Thus, utilization of affiliated exchange members results in significant savings to the institution, in the form of "recaptured" or "rebated" commissions.[15] These savings redound to the benefit of the institution's shareholders, policy holders, or beneficiaries.
 The foregoing discussion underscores the potential magnitude of the impact of the Commission's action on the petitioners. If the validity of Rule 19b-2 is sustained, PBW can solicit no more institutional members, and must "phase out" its current institutional members over a three-year period.[16] If the current vitality and viability of PBW hinges upon the presence of institutional members, PBW asserts that Rule 19b-2 will usher in an era of stagnation, or will result in its utter demise. And, even assuming PBW has overstated the degree of its dependence upon its institutional members, it seems undeniable that the portion of its revenues attributable to those members will, at the very least, greatly diminish.
 The other petitioners-the institutional members themselves-will, perhaps, suffer even more drastic repercussions from the promulgation of Rule 19b-2. Each will be forced to undertake a fundamental transformation of its business, from the status of a "broker-affiliate" of an institution to that, in effect, of an "independent" broker-dealer. More likely, the petitioner-brokers will simply go out of business, for, after all, each was formed with a view to acquiring exchange membership as a broker-affiliate of an institution. If we posit that it will not be feasible for an institution to maintain a broker-affiliate after Rule 19b-2 is in effect, institutions that have utilized broker-affiliates will again be forced to expend substantial amounts, in commissions, every time a trading order is executed.
 It is thus apparent that the practical effect of the Commission's promulgation of Rule 19b-2, if that action is sustained, will be deleterious to the petitioners in this case. To them, the Commission's action is neither "abstract, theoretical, nor academic."[17] Viewed as a substantive matter, the Rule would effectively determine their rights, and following upon that determination would work or cause a major dislocation and transformation of their day-to-day business affairs.
 II.
 Since the enactment in 1946 of the Administrative Procedure Act ("APA") the federal courts have entertained a "presumption" in favor of the reviewability of administrative action. In Abbott Laboratories v. Gardner,[18] The Supreme Court undertook to trace the contours of that presumption. The petitioners there had sought in a district court, pre-enforcement review[19] of drug-labeling regulations promulgated by the Commissioner of Food and Drugs. The district court reached the merits of petitioners' contentions and granted relief. This Court, however, thought that Congress had impliedly expressed an intention to withhold from the district courts any jurisdiction to undertake pre-enforcement review of the regulations. Accordingly, we reversed the district court. The Supreme Court, in turn, reversed us finding that nothing in the Food, Drug, and Cosmetic Act precluded the institution of such action.[20]
 The Supreme Court in Abbott reached its result by a course laden with instruction that should inform the present inquiry. Justice Harlan, speaking for the majority, perceived first that:
 "[T]he Administrative Procedure Act . . . embodies the basic presumption of judicial review to one 'suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute,' . . . so long as no statute precludes such relief or the action is not one committed by law to agency discretion. . . ."[21]
 He then cited a portion of the APA's legislative history expressing the intention of Congress that, after passage of that Act, statutes would be deemed preclusive of judicial review only if "clear and convincing evidence" of an intent to deny review could be adduced.[22] Commenting upon the Court's earlier exegeses of the APA's legislative history, Justice Harlan reiterated that the APA's "'generous review provisions' must be given a 'hospitable interpretation."'[23] The majority's pronouncements in Abbott provided firm conceptual underpinning for the thoroughgoing inquiry then undertaken into the history of the Food, Drug, and Cosmetic Act.[24] Unable to discern in that Act's background any clear, convincing and unambiguous evidence of an intent to preclude review, Justice Harlan determined that the case should be remanded to this Court for consideration on the merits.[25]
 While the question immediately before the Court in Abbott concerned the availability of review of agency action in the district court,[26] the significance of the reasoning and language there employed reaches well beyond the particular facts of that case. Justice Harlan, in his elucidation of the APA's impact upon the law of reviewability, relied principally on two sections of the APA that bear directly upon the present controversy. First, he referred to section 10(a), 5 U. S.C. Sec. 702, as the "embodiment" of the presumption favoring reviewability. Second, he cited section 10(c), 5 U.S.C. Sec. 704, as being among the "generous review provisions" entitled to a "hospitable" interpretation.
 What is particularly germane to our inquiry is the fact that both section 10(a) and 10(c) advert to other statutes specially tailored to provide for judicial review of agency action. Section 10(a) extends review to persons "adversely affected . . . by agency action within the meaning of a relevant statute," while 10(c) provides, inter alia, that "[a]gency action made reviewable by statute . . . [is] subject to judicial review."[27] (Emphasis added) It works no distortion of Justice Harlan's analysis in Abbott to conclude that the "hospitable" interpretation afforded the statutory language pertinent in that case must extend to all of the language in the cited sections of the APA.[28] Thus, since section 25(a) of the Exchange Act appears, at least prima facie, to be a "relevant statute" within the meaning of 19(a) of the APA, and a "statute" within 10(c), the interpretive leeway stipulated by Abbott regarding those sections must, in some fashion, affect an appropriate construction of section 25(a).[29]
 Our task, then, is to follow the course charted in Abbott-a course whose outer limits it was unnecessary to explore in that case-and apply the principles enunciated there to a determination of the proper interpretive stance to assume in construing section 25(a).[30]
 If the presumption of reviewability is to have significance in the interpretation of special statutory review provisions, the presumption must, somehow, actually structure our reading of the provision in question. Thus, confronted with the special review procedure set forth in section 25(a), it would not seem amiss to postulate that Congress intended, at least after the passage of the APA, for that section to be read broadly, "generously," and "hospitably."[31] We presume, in short, in favor of the reviewability of agency action colorably within the terms of the section.[32] Pursuing Abbott's teachings further, a cribbed or miserly reading of section 25(a) would be called for only where there was "clear and convincing evidence" of a Congressional intent that the section be so confined.
 Accordingly, our initial problem in ascertaining the scope of 25(a) is to determine what constitutes a "restrictive" reading of the statute, and, conversely, what may properly be deemed a "generous" reading.
 III.
 Though the endeavor of statutory construction in any given case need not end with the words of the enactment, a court should certainly begin there.[33] Admittedly, an initial scrutiny of the terms of section 25(a) might seem, as the majority feels, to put an end to our inquiry. It provides
 "Any person aggrieved by an order issued by the Commission in a proceeding under this title to which such person is a party may obtain review of such order in the Court of Appeals of the United States, within any circuit wherein such person resides or has his principal place of business. . . ." (Emphasis added)
 Were statutory construction an exercise undertaken in vacuo, uninformed by practical considerations, experience, or precedent in related area of the law, there might be no basis for concluding that adherence to the literal terms of this statute, clear in themselves, is in any sense "restrictive." But here, we have at hand an extensive body of writing in the field of administrative procedure, by courts and commentators alike, against which to contrast the literal reading of 25(a) espoused by the majority. The comparison provides a firm foundation for the conclusion that the limitation of review under 25(a) to formal "orders" is indeed restrictive.
 In the seminal case of Columbia Broadcasting System, Inc. v. United States,[34] the Supreme Court considered the reviewability of action taken by the Federal Communications Commission. The Commission had, by a document formally denominated an "order," issued regulations designed to control certain contractual relations between broadcasting networks and their affiliated stations.[35] CBS brought an action in the district court to have the regulations set aside, invoking the district court's jurisdiction under section 402(a) of the Communications Act of 1934, and the Urgent Deficiencies Act.[36] Inasmuch as the regulations had been issued in the form of an "order," the precise question before the Court could, perhaps, be framed as whether the "order" in question was of the type made reviewable by section 402(a). Nonetheless, the Court directed its attention not to the narrow issue alone, but considered whether the regulations, viewed as regulations, were reviewable.[37] Seen from such a perspective, the Court's conclusion, and, more importantly, the methodology used to reach that conclusion, serve as an apt benchmark against which to measure the approach by the majority here to section 25(a) of the Exchange Act.[38]
 The FCC had styled the Chain Broadcasting Regulations as "the expression of general policy we will follow in exercising our licensing power."[39] Recognizing that the FCC had adopted the regulations under its rulemaking power, the Court did not hesitate to characterize them as "regulations which affect or determine rights generally, even though not directed to any particular person or corporation. . . ."[40] But in answer to the contention that this concededly "legislative" character rendered the regulations unreviewable, the Supreme Court declined to embrace, as the touchstone or reviewability, the distinction between agency "adjudication" and "quasi-legislation."[41] Rather, it scrutinized the practical import of the agency's action:
 ". . . [A] valid exercise of the rule-making power is addressed to and sets a standard of conduct for all to whom its terms apply. It operates as such in advance of the imposition of sanctions upon any particular individual. It is common experience that men conform their conduct to regulations by governmental authority so as to avoid the unpleasant legal consequences which failure to conform entails. . . .
 
 
 ******
 
 * * *
 "Such regulations have the force of law before their sanctions are invoked as well as after. When, as here, they are promulgated by order of the Commission and the expected conformity to them causes injury cognizable by a court of equity, they are appropriately the subject of attack under the provisions of Sec. 402(a) and the Urgent Deficiencies Act."[42]
 The Court thus rejected the notion that formal appellation as an "order" should serve as the indispensible talisman of reviewability. Rather, it held that "regulations which affect or determine rights generally even though not directed to any particular person . . . have the force of law and are orders reviewable under the Urgent Deficiencies Act."[43] Eschewing literalism, the Court enunciated the approach that has since guided most judicial determinations of reviewability: "The particular label placed upon it by the Commission is not necessarily conclusive, for it is the substance of what the Commission has purported to do and has done which is decisive. . . ."[44]
 Fifteen years later, in Frozen Food Express v. United States,[45] the Supreme Court reaffirmed the position taken in CBS. The Interstate Commerce Commission had issued an "order" declaring that certain products fell without the statutory exemption from regulation accorded agricultural commodities. The plaintiff, a motor carrier in the business of transporting such commodities, challenged the order. The district court dismissed, on the ground that the "order" was not subject to review. On appeal, the Supreme Court reversed, since in its view the order was "not . . . abstract, theoretical, or academic," and in fact served as "the basis for carriers in ordering and arranging their affairs."[46] The crucial barometer of reviewability, asserted the Court, was the "immediate and practical impact" of the agency's action.[47]
 That same year, in United States v. Storer Broadcasting Co.,[48] the Court undertook another disquisition on the law of reviewability. The petitioner had sought review in a court of appeals of an "order" of the Federal Communications Commission, pursuant to a special review provision similar in its terms to section 25(a) of the Exchange Act. The order affected an amendation of the "Multiple Ownership Rules," governing corporate relationships among television stations.[49] The Court held the amending order reviewable, relying heavily upon language from its earlier CBS opinion.[50] Again the decisive finding was not that the Commission's action had taken the form of an "order," but that "[t]he Rules now operate to control the business affairs of Storer."[51]
 The foregoing triad-CBS, Frozen Foods, and Storer-has an overarching significance extending well beyond the particular circumstances of the three cases. In light of the continuing dependence on those cases by courts grappling with the question of reviewability, it is fair to say that, today, the views adopted in these three decisions constitute a "rule" of federal administrative law. The rule favors review where the "impact" of agency action is, as in this case, concrete and immediate; it favors elevation of the substance of that action over form, as the proper indicium of reviewability; it counsels a readiness to forego slavish adherence to the literal terms of special review statutes. Chief Justice Stone put it as follows:
 "The ultimate test of reviewability is not to be found in an overrefined technique, but in the need of the review to protect from the irreparable injury threatened in the exceptional case by administrative rulings which attach legal consequences to action taken in advance of other hearings and adjudications that may follow, the results of which the [rulings] purport to control."[52]
 Courts confronted with the task of applying section 25(a) or section 24(a) of the Public Utility Holding Company Act[53] have, for the most part, accorded them a reading which comports with the "rule" of CBS.
 In American Sumatra Tobacco Corp. v. Securities and Exchange Commission,[54] three corporations objected to the disclosure by the Commission of certain information contained in their registration statements. The Commission, by "order," denied the applications for confidential treatment. The companies then sought review under section 25(a) of the Commission's action. Before the District of Columbia Circuit, the Commission contended that reviewable orders within the contemplation of 25(a) are those entered only after notice and hearing, and upon a finding of facts. That court declined to adopt the Commission's penchant for formalism, holding instead that since the petitions "allege[d] irreparable injury," review could be obtained.[55]
 The Second Circuit, in Phillips v. Securities and Exchange Commission,[56] considered the scope of section 24(a) of the Public Utility Holding Company Act. The Commission had ordered United, a company in which one petitioner held stock, to cease its existence as a holding company, but stayed the issuance of a dissolution order in view of United's expressed intention to become an investment company. In conjunction with the stay, the Commission stated that United should obtain the approval of a majority of its shareholders before undertaking the transformation of its business. Upon United's request, the Commission issued a "memorandum opinion," this time to the effect that United need not obtain the approval of its preferred shareholders. The Commission also issued a "minute" denying the petitioner's request for a hearing on solicitation material submitted by United, and for a rehearing on the decision not to require inclusion of the preferred shareholders in a vote on the transformation.[57] Neither the "memorandum opinion" nor the "minute" were termed "orders" by the Commission.
 Phillips, a United shareholder, sought review of the Commission's actions under 24(a). Inasmuch as final approval of United's transformation awaited further statutory proceedings before the Commission, the Second Circuit deemed the attack on the agency's action premature. But the court made clear that the mere absence of the word "order" was, in itself, no bar to review:
 "We of course agree with the Commission in its concession that the form in which it couched its action is irrelevant beyond showing its own conception of what it had done. It is the substance which must control and lack of a formal order will not of itself bar review."[58]
 Not surprisingly, this refusal to predicate findings of reviewability upon the presence of a formal "order" was grounded in the Second Circuit's reading of CBS.[59]
 The District of Columbia Circuit took essentially the same tack with regard to 24(a) in Philadelphia Co. v. Securities and Exchange Commission.[60] Philadelphia, a registered utility company, owned the stock of Pittsburgh Railways, which had filed a petition for reorganization under the Bankruptcy Act. By Commission rule, Pittsburgh had been exempted from the operation of the Holding Company Act while undergoing reorganization. Accordingly Pittsburgh did not submit for Commission approval its plan of reorganization. Instead, it proceeded with implementation of the plan, under the district court's sole supervision.
 With the case in this posture, the Commission amended the rule that had afforded Pittsburgh its exemption from the Holding Company Act. The amendation was effected without a full hearing, and publication of the amendment was not styled an "order" by the Commission.[61] As a consequence of the amendment Pittsburgh lost its exemption, and, by the terms of the Act, was required to submit its reorganization plan to the Commission. Approval could be secured only on condition that there was compliance with certain substantive provisions of the Act.
 Philadelphia sought review under 24(a). The statutory provision under which the Commission had proceeded authorized action both by "rules and regulations" and by "order."[62] As in the present case the Commission opted to move by rule, and, as here, the agency made much of the fact that its action was cast "in general terms."[63] These factors did not sway the District of Columbia Circuit. Relying upon CBS, it said:
 ". . . [N]either the presence nor the absence of a label is controlling . . . . [N]ot even the fact that the action of an administrative agency is phrased to apply generally, or may indeed have general application, is necessarily conclusive that its action is not subject to review as an 'order' . . . . under Section 24(a) of the Holding Company Act. If in its impact a 'rule or regulation' applies specifically and affects or determines the rights of a particular person or corporation, then the action of the agency in promulgating it is reviewable even though the 'rule or regulation' is not directed in terms to any particular person or corporation."[64]
 The court concluded that the Commission's revocation of Pittsburgh's exemption-an action with an immediate and significant "impact" upon Pittsburgh, Philadelphia, and others-was subject to review.
 The precept that emerges from American Sumatra, Phillips, and Philadelphia, that provisions for review of Commission "orders" are not to be read restrictively, reflects the notions of Professor Louis Loss, an acknowledged leader in the securities law filed, who served as counsel to the Commission in its early years:
 "While the Commission's action sought to be reviewed . . . did not even take the form of an order, that in itself is of no consequence. Whether there is a reviewable order is a question of substance rather than form."[65]
 Only recently, this distaste for literalism has been reaffirmed by the District of Columbia Circuit. In Medical Committee for Human Rights v. Securities and Exchange Commission,[66] the scope of section 25(a) was again considered. The Medical Committee, a minority shareholder of Dow Chemical, had requested that Dow's management include a certain proposal in its proxy statement. Dow resolutely refused, and the Committee requested Commission review of Dow's action. A division of the Commission sent Down and the Committee a letter, stating that it would take "no action" concerning Dow's refusal to include the proposal in its proxy material. The full Commission later approved the "no action" recommendation.
 The Committee sought review of the agency's action, or inaction, under 25(a), and the Commission "consistently and vigorously urged . . . that [the] court [of appeals] is without jurisdiction. . . ."[67] The court found in neither the legislative history nor in precedent an "unambiguous answer" to the question whether section 25(a) contemplated review of the action taken. Consequently, it resorted to what it styled "general principles and analogies" to settle the matter.[68] After examining the relevant materials on reviewability, the court isolated three considerations it deemed pivotal in any application of section 25(a): first, an ascertainment "whether the administrative action operates with final effect upon a particular individual, entity, or group;[69] second, a review of the formalities attending the agency action, since "the notion of an 'order' implies some formal characteristics;"[70] and that, in consonance with CBS and its progeny,
 ". . . [P]ragmatic considerations, particularly those relating to the institutional relationships between the courts and the administrative agencies, must prevail over purely doctrinal arguments for or against reviewability."[71]
 Applying its tripartite test, the court held the Commission's "no action" decision reviewable under section 25(a). The absence of anything formally denominated an "order," though perhaps given some consideration under the court's second analytical principle, did not merit an explicit mention.
 It is apparent that the doctrine developed in CBS is not confined to questions arising in an identical factual context. Rather, there has emerged from CBS a rule of administrative law that pervades consideration of the statutory structure and function of all Federal administrative agencies. Like the rule of Abbott, the doctrine of CBS evidences a strong presumption in favor of review. It serves as a directive to courts to depart from literalism and "over-refined technique"[72] in the construction of statutory review provisions. And, as the foregoing discussion makes clear, courts construing provisions for review of Commission action have consistently declined to adhere to the literal terms of those provisions. Instead, judicial scrutiny has concentrated upon the "substance" and "impact" of Commission action. Where the action taken has, effectively, determined the rights and obligations of a particular person or corporation, and where the impact has been immediate, the action has been deemed reviewable under 25(a).[73]
 Viewed in the setting provided by CBS, Frozen Food, and Storer, and against the implementation of the CBS principle in cases involving Commission action, the majority's dogged insistence on a literal reading of section 25(a) can fairly be characterized as "restrictive." Keeping in mind the tenets of Abbott, it would be justifiable to indulge this proclivity for literalism only in the event that clear, convincing, and unambiguous evidence of Congressional intent to restrict the application of 25(a) to formal "orders" could be produced. The majority is satisfied that perusal of the legislative history "reveals a clear and unequivocal intention to insulate Commission rules or regulations from review under Sec. 25(a)." I think it correct to say that the history of the Exchange Act manifests, at most, Congressional uncertainty as to the scope of that section. In any case, the evidence that may be gleaned from the legislative history falls considerably short of the quantum that would justify limitation of review under 25(a) to formal "orders."
 IV.
 As the majority points out, the Commission, in promulgating Rule 19b-2, relied upon the authority conferred by section 19(b) of the Exchange Act.[74] That section authorizes the Commission to utilize either "rules or regulations" or "orders" to effect changes in the rules of securities exchanges. Nothing in the statute or the Commission's rules of practice would have precluded promulgation of Rule 19b-2 by "order."
 By restricting the availability of review under 25(a) to formal "orders," the majority generates an anomalous state of affairs. For if the Commission may bring about precisely the same result by either "rule" or "order," there is vested in the Commission the sole discretion to determine whether action taken pursuant to 19(b) shall be subject to review. Such power is defended by the majority first by reference to the literal terms of sections 19(b) and 25(a). Second, the majority seeks to cull from the legislative history of the Exchange Act what it considers is clear and convincing evidence of an intent to permit this result. My reading of that history provides no such definitive answer as to Congress' intent in using solely the word "order" in 25(a). Still less does the history support any conclusion that Congress intended to confer on the Commission the sole power to curtail recourse to the courts, merely by affixing a particular label to its actions.
 The majority looks first to the remarks of Representative Fish of New York, who, in the House floor debates on the bill that became the Exchange Act firmly contended that section 19(b) [then numbered 18(b)] should be phrased so as to allow the Commission to act only by "order."[75] At that time, 19(b) as drafted permitted the Commission to effect changes in the rules of exchanges by utilizing only "rules or regulations."
 Admittedly, it was Representative Fish's understanding that the change in statutory language-from "rules or regulations" to "orders"-would "permit recourse to the courts."[76] The Fish amendment was rejected. However, a compromise was later developed in the Senate-House conference, and 19(b) was amended to permit the Commission to move either by "rules or regulations" or "orders"[77] The majority confidently asserts that the compromise "in no way vitiated the Congressional feeling as to the insularity from review under Sec. 25(a) enjoyed by a rule or regulation. . . ." But it is not altogether clear that Representative Fish shared that confidence. Commenting upon the compromise version of the bill, he voiced his satisfaction at the elimination of the "drastic provisions" contained in the earlier House version.[78] Presumably, one such "drastic provision" had been the pre-compromise version of 19(b), which in Fish's eyes had foreclosed "any recourse whatever to the courts."[79] The new version, asserted Fish, was "much fairer."[80] There is no evidence on which to base a belief that Fish's new-found contentment was predicated upon the understanding that the Commission could, simply by opting to take action by "rule" instead of "order," insulate that action from review. Rather, it is more plausible to infer that, in Fish's view, Commission action under 19(b) no longer enjoyed such insularity, that "rules," "regulations," and "orders" were coequal with respect to their reviewability. In any case, the effect of the compromise version of 19(b) on Fish's understanding is at least open to question. Consequently, his remarks are a far cry from the "clear and convincing" evidence requisite to a narrow construction of 25(a).[81]
 The majority next cites the remarks of Representative Lea, an opponent of the Fish amendment. Lea spoke before the compromise version of 19(b) was adopted, and his words, therefore, refer only to the pre-compromise limitation to "rules or regulations" contained in the House bill. In Lea's view, this limitation was crucial, because it was:
 ". . . important that we shall not give the exchanges the right to appeal . . . from the action of the Commission in making rules and regulations. It would subject the Commission to endless harassment."[82]
 Of course, once the compromise version of 19(b) was adopted by the House-Senate conference, the exchanges did have the right to appeal, at least where "rules and regulations" were promulgated by formal "order." Assuming judicial review can properly be termed "harassment," we are without any indication whether Representative Lea felt, after the compromise, that all or only some of the Commission's actions would be subject to such harassment. In short, it is once again unclear to what extent the inclusion of the term "orders" in 19(b) "vitiated" earlier sentiments as to reviewability.
 Indeed, it appears that even Representative Lea comprehended that "quasi-judicial" action by the Commission was, in any event, always subject to review. His feeling that "rules" were generally not reviewable was based on the supposition that rulemaking is, typically, a "quasi-legislative" function.[83] However, he openly adverted to the fact that the Commission might take quasi-judicial action in the guise of a "rule." Lea seemed to have no doubt that such action would be reviewable:
 "There would be a quasi-judicial power, perhaps if under a rule the Commission should attempt to determine whether an alleged guilty man should be penalized or subjected to a fine. That the exercise of quasi-judicial power over the exchange would give it the right to go to court. The exchange would not have the right to claim the attention of the court until it claims to be injured by the Commission."[84]
 Apparently Representative Lea was of the impression that "injury" to particular persons would rarely, if ever, result from the issuance of "rules," that a clear line demarcated the boundary between the "adjudicative" and "legislative" functions of administrative agencies. Today we know otherwise.[85] We know, for example, that "rules," like adjudicative "orders," often determine rights and obligations, that they may have the "force of law" and give rise to "irreparable injury."[86] Thus, if we are to take Lea's remarks at face value, it appears that he might well have agreed that even the original House version of 19(b), allowing action only by rule, could give rise to much more reviewable action than he had at first thought. Again, the inferences that can fairly be drawn from Lea's remarks concerning reviewability of Commission action are of less than univocal significance.
 The statements of Representative Rayburn quoted by the majority hardly provide more clarity concerning Congress' understanding. His remark that Commission "orders" would become "tied up in the courts"[87] antedated adoption of the compromise version of section 19(b). After that adoption, of course, "rules and regulations [issued] in the form of orders"[88] could be so "tied up." It may be taking undue license considering the limited evidence, to impute to Mr. Rayburn, as the majority does, the converse thought that "orders" issued in the form of "rules" could not be appealed.
 Mr. Rayburn did feel, as the majority admits, that review would be available if "the Commission exceeded its jurisdiction and its authority under the Act."[89] The petitioners contend that this is precisely what has transpired in the promulgation of Rule 19b-2. While this isolated remark of Rayburn's is inconclusive, it at least injects a further note of equivocation into his understanding concerning the reviewability of action taken pursuant to 19(b).
 The plain fact is that the paucity of legislative comment on the amended version of 19(b) once more furnishes an unclear idea of Congress' final understanding as to availability of judicial review.[90]
 In this connection, the majority attempts to make much out of a colloquy before the Senate Committee on Banking and Currency, concerning section 25(a) (section 24(a) in the bill). The New York Stock Exchange had proposed that the section be drafted to read as follows:
 "Any person aggrieved by an order issued by the Commission in a proceeding under this Act to which such person is a party and any person aggrieved by any rules or regulations of general applications made effective as prescribed in section 20 may obtain a review of such order."[91]
 Senator Barkley expressed his dismay at the proposal, which would in his view "make it possible for anybody to go into court and make a general attack."[92] Indeed, the proposed language would seem to permit such an attack, extending review as it did to any "person," whether or not that person was a "party" to the rulemaking "proceeding." The final version of 25(a), of course, is not that broad in its terms: review is restricted to "parties" to formal "proceedings." Thus Senator Barkley's misgivings, generated by a proposal much broader in impact than the reading contended for by the petitioners in this case, add little to an understanding as to when a party to a proceeding may obtain appellate review.
 Inspection of the scant history available does not, of course, permit one to say with assurance that Congress fully intended the word "order" in 25(a) to be taken to include "rules or regulations." Thus, in an ordinary case of statutory construction a reasonable argument to the effect that 25(a) is to be read restrictively could, perhaps, be hinged upon the slender quantum of evidence we have before us. But judicial construction of a provision for review of agency action is no "ordinary" case. Rather, we must pay close heed to the structures of the Administrative Procedure Act, and to the Supreme court's teachings in Abbott, and demand a stronger showing of Congressional intent. This is particularly so where the reading contended for is a restrictive one, one which, if implemented, would tend to preclude the availability of review. Since the Commission and the majority would adhere to the literal terms of 25(a)-and inasmuch as that adherence is, when contrasted to the clear trend of thought in administrative law, properly styled "restrictive"-they must shoulder this heavier burden. They must, in short, show by clear, convincing, and unambiguous evidence Congress' intent to so restrict the application of the statute. This, I respectfully suggest, they have failed to do.
 It is interesting to note that, only recently, members of the Commission itself have expressed doubt whether action taken pursuant to 19(b) may be insulated from review. Speaking before a Senate subcommittee,[93] former Chairman Casey expounded his conception of the nature of a 19(b) proceeding, in response to a query put by Senator Williams:
 "The procedure is to formulate an exchange rule, request the exchange to adopt it."If the exchange is unwilling to adopt it, then you call a hearing . . . at the end of which the Commission would make a determination which would be appealable to the courts."[94]
 Commissioner Loomis evinced less certainty as to the reviewability of action taken under section 19(b):
 "[Section] 19(b) is completely silent on the subject of judicial review of a 19(b) proceeding. It doesn't mention it. In fact, former Speaker Rayburn stated on the floor of the House in 1934 that there would be no judicial review of a 19(b) proceeding, but I suspect the passage of the Administrative Procedure Act may have changed that."[95]
 The views of the two Commission members, though somewhat divergent and admittedly not conclusive, do indicate that those vitally interested in discerning Congress' precise intent as to the reviewability of Commission action have been unable to weave from the fibers of the legislative materials anything approaching a level of "clear and convincing" evidence. In the absence of such evidence, resort must be had to general principles, to precedent, and to common sense to settle the issue. We should look, in short, not to the label affixed to Rule 19b-2 by the Commission, but to the impact of that rule upon petitioners. If that impact is found to be substantial, concrete, and immediate, a court of appeals should assume jurisdiction under 25(a).
 
 
 V
 
 The factual circumstances of this case make abundantly clear that Rule 19b-2 will have a material impact upon both PBW and the other petitioners. At the same time, it cannot be denied that the rule is of somewhat "general" application; that others-albeit very few-besides these petitioners will feel its effects. Yet, as a review of the pertinent cases has shown, the generality that inheres in "rules" has no magical significance. The Supreme Court in CBS took pains to emphasize that the concededly "legislative" character of action taken pursuant to a rule-making power does not, of itself, bar the door to review. Consequently, the application of 25(a) to this case must not stop at the point where the quasi-legislative nature of Rule 19b-2 is established. Rather, the practical effect of the rule is the lodestar by which we must navigate. Where, as here, such an effect can be shown, and where there is no legislated compulsion to honor only the literal terms of the statute, a "rule" is no less subject to review under 25(a) than is an "order."
 It is not unrealistic to assume that petitioners, though vigorously opposed to the adoption of Rule 19b-2, will conform their activity to the strictures of the rule rather than disobey and risk subjection to enforcement proceedings. Thus, the rule has the "force of law before [its] sanctions are invoked," and "conformity to [it will cause] injury."[96] Both PBW and the petitioner-brokers will find their business affairs-perhaps their very existence-"controlled" by the rule.[97] Nor is this prospect remote. The rule requires institutional members to file with the exchanges, within 30 days of the rule's effective date, statements of their intention to comply. Thus, in substance-and "substance" is the focal point of our inquiry[98]-the Commission's action is of such immediate and concrete significance that we should proceed to hear the merits of petitioners' claims.
 As has been shown, the pragmatic considerations to which our attention is directed by CBS, Medical Committee for Human Rights, and other cases, strongly suggest that jurisdiction under 25(a) rests in this Court to review the promulgation of Rule 19b-2. The applicable authorities also indicate that the majority's insistence on a narrow reading of the statute is misguided; this case lends substance to the adage that "there is no surer way to misread a document than to read it literally."[99]
 Our jurisprudence, at least insofar as it has contemplated the reviewability of administrative action, has long abandoned the apotheosis of form. Once it can be shown that administrative action constitutes, at least as to some persons, an effective determination of rights and liabilities, the precise form in which that action is couched is no longer determinative.
 Of course, if Congress chooses to be parsimonious in conferring jurisdiction to review agency action, such is its prerogative. Congress, in short, has the power to elevate form over substance. But as the Supreme Court pointed out in Abbott, courts are never to presume Congressional parsimony. Absent clear and convincing proof, we may conclude only that Commission action having the impact Rule 19b-2 will have on these petitioners is subject to review within the terms of section 25(a).
 My approach to this case does not proceed from any special solicitude for these petitioners nor, certainly, from any conviction that each and every facet of governmental activity vests in those affected, eo instante, rights to judicial review.[100] Rather, it is impelled by a recognition that the announcement of definitive regulatory policy may be, to the layman affected, "the last expression of the law on the case."[101] Where this de facto finality attaches, that is, where rights and liabilities of particular persons are determined by administrative action, our law generally provides for judicial superintendence. Congress may, within constitutional limits, stipulate otherwise. But ordinarily judicial superintendence is heralded as a "right," and an intention to preclude, it, or to stay its availability, is not lightly to be inferred.[102] And this would seem particularly so when more and more of the social and economic aspects of life are being governed by agency action.
 Another court has concluded that review of Commission action in a court of appeals under 25(a) is to be preferred to district court review only where a clear and formal evidentiary record already exists.[103] Resolution of the questions raised by these petitions-all legal in nature-can probably be achieved without resort to any fact-finding machinery. In addition, while the superiority of the fact-finding apparatus of a district court may be conceded, section 25(a) empowers a court of appeals to remand a case to the Commission for an evidentiary record if such were to become appropriate. Thus, district court review and review here create at least an "equal inconvenience" for the Commission;[104] the expedition provided for by the mechanism of 25(a) will likely create less inconvenience for all involved. In these circumstances, where the special competence of the district court would avail nothing, there remains no reason for concluding that this Court should decline consideration of petitioners' contentions.
 Unlike the majority, I would hold that we do have jurisdiction to consider the important questions framed by these petitions.
 
 
 [1]
 17 C.F.R. Sec. 240.19b-2 (1973)
 
 
 [2]
 Hereinafter cited as Exchange Act
 
 
 [3]
 We note that petitioners, in their brief opposing the SEC's motion to dismiss, attempt to equate the question of whether they can obtain judicial review of this rule with the question of whether jurisdiction lies in this court to review this rule under Sec. 25(a). We reject this attempt to unnecessarily obfuscate the issue of the availability of direct appellate review of Commission rules and regulations. We emphasize that in this opinion we are dealing only with this latter question. The availability of other types of review, particularly in the district court, is governed by Sec. 10 of the APA and provisions of Title 28. See Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L. Ed.2d 681 (1967); Leedom v. Kyne, 358 U. S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958)
 We wish nothing stated in this opinion as to the availability of relief in this court under Sec. 25(a) to reflect negatively on the question of whether judicial review is otherwise available in another forum.
 
 
 [4]
 Cf. Schwab v. Quesada, 284 F.2d 140 (3d Cir. 1960)
 
 
 [5]
 15 U.S.C. Sec. 77a et seq. (1971)
 
 
 [6]
 The other five subsections are: 15 U.S.C. Secs. 78d-1; 78l(g) (3) & (h); 78m(d) (5); 78o(a) (2) (1971). Parenthetically, it should be noted that the remaining sections under which the Commission purported to act do not give it the power to proceed otherwise than by rule or regulation
 
 
 [7]
 See, e. g., comment of Rep. Rayburn, 78 Cong.Rec. 8091, and amplification at 8093. Cf. Leedom v. Kyne, supra
 
 
 [8]
 It must be remembered that the standards for judicial review of agency action were not definitively established until 1951 in Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456
 
 
 [9]
 To the extent Congress relented by its actions in 1946-enactment of the APA, and in 1948-the Declaratory Judgment Act, courts may take cognizance of a legislative intention to broaden the availability of judicial review of both Congressional and agency action, at least within limited parameters. See, e. g., Abbott Laboratories v. Gardner, supra. However, that in no way affects the question of whether Congress intended to allow Sec. 25 review of Commission rules and regulations
 
 
 [10]
 Hereinafter cited as UDA. At the time of the Columbia Broadcasting decision, it was codified at 28 U.S.C. Sec. 47 (superseded)
 
 
 [11]
 The Court noted there that one of the hurdles to be overcome in seeking review of certain types of "negative" orders under the UDA was the "specific terms of the statute granting to the district court jurisdiction in suits challenging 'any order' of the Commission." 307 U.S. at 132, 59 S.Ct. at 758
 
 
 [12]
 We note that Powell was always cited in tandem with AF of L v. NLRB, supra, in the Columbia Broadcasting opinion
 
 
 [13]
 We note the same session of the same Congress enacted both the Exchange Act and the Communications Act of 1934. They were enacted one day apart-June 6 & 7, 1934, respectively
 
 
 [14]
 Additionally, we note Sec. 25(a) has never borne any semblance to the provisions of the UDA, nor did the draftsmen express any intent to incorporate any element of that act. Thus, the legislative history and precedent under that act cannot be attributed in any way to Sec. 25
 
 
 [15]
 Of course, if a court were confronted with a situation in which the Commission attempted to cloak clearly quasi-judicial action in quasi-legislative garb, different factors might militate in favor of this court's review. We are not faced with such a situation in the instant case
 
 
 [1]
 See, e. g., Securities and Exchange Commission, Statement on the Future of the Securities Markets (6 P.O. ed. 1972); Securities and Exchange Commission Institutional Investor Study Report, H.R.Doc.No.92-64, 92d Cong., 1st Sess. (1971)
 
 
 [2]
 See generally Securities and Exchange Commission, Statement, supra, at 6-22
 
 
 [3]
 17 CFR 240.19b-2 (1973). The Commission published the Rule, along with an extensive discussion thereof, in Release No. 9950, hereinafter cited as "Release."
 On May 26, 1972, the Commission wrote individual letters to the exchanges, requesting the voluntary adoption by each exchange of a rule incorporating the substance of Rule 19b-2. PBW Stock Exchange, Inc., refused. According to the Commission, it was the only exchange that seriously opposed the expulsion of institutional members (SEC White Paper on Institutional Membership, presented to the Senate Subcommittee on Securities of the Committee on Banking. Housing and Urban Affairs, April 20, 1972, at p. 30). The Commission then published Rule 19b-2 for comment on August 3, 1972. PBW requested a hearing prior to adoption of the Rule, and the Commission denied the request. Written comment on the proposed Rule was received, oral argument heard, and it was adopted on January 16, 1973.
 
 
 [4]
 The Commission cites sections 2, 6, 11, 17, 19 and 23 of the Exchange Act, 15 U.S.C. Secs. 78b, 78f, 78k, 78q, 78s and 78w, as providing the substantive authority for promulgation of the Rule, and invokes section 4 of the Administrative Procedure Act, 5 U.S.C. Sec. 553, as authorizing its use of rule-making procedures in the Rule's formulation and adoption
 
 
 [5]
 The Rule is designed to effectuate the Commission's determination that:
 "the nation's securities exchanges are effected with and intended to be responsive to the public interest; that membership on such exchanges should carry with it an obligation to serve investors dealing on those exchanges; and that membership utilized primarily for the purpose of proprietary trading for the account of the member or for an account in which it has an interest or for the purpose of rebating or recapturing commission charged on exchange securities transactions, directly or indirectly, is inimical to the protection of investors, fair dealing in securities traded in [sic] upon such exchanges, and the interests of the public investors we are mandated to protect. . . ." Release, at 1-2. (Emphasis added)
 
 
 [6]
 See Columbia Broadcasting System, Inc. v. United States, 316 U.S. 407, 416, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942); see also L. Loss, Securities Regulation 1140 n. 2 (1951 ed.)
 
 
 [7]
 See Statement of Philadelphia-Baltimore-Washington Stock Exchange Regarding Institutional Membership, Oct., 1971, at p. 1
 Since the majority would dismiss this case on jurisdictional grounds, it is appropriate that we take as true the "allegations" of the petitioners in determining whether jurisdiction lies. Accordingly, this opinion, as do the majority, makes liberal use of the supporting factual material submitted by the petitioners.
 
 
 [8]
 Brief of petitioner PBW Stock Exchange, Inc. at p. 6
 
 
 [9]
 The Pacific Coast Stock Exchange was the first exchange to admit to membership subsidiaries of institutional investors. It now has 18 such members. The Midwest Stock Exchange admits such members if they do at least 50 per cent of their business on the exchange with non-affiliated customers. The Boston Stock Exchange has a few institutional members
 
 
 [10]
 Between 1968, when PBW began soliciting institutional memberships, and 1971, trading on the exchange increased from 48 million to 112 million shares. See Statement of PBW, supra, at p. 5
 
 
 [11]
 Id., at p. 6
 
 
 [12]
 Id
 
 
 [13]
 Id
 
 
 [14]
 Id
 
 
 [15]
 See Note 5, supra
 
 
 [16]
 This discussion assumes that, from the point of view of the investing institution, it would ordinarily not be feasible to maintain membership on an exchange in the face of a rigid requirement that 80 per cent of its exchange business be transacted with or for the "public." Only 15 out of the 38 institutional members of PBW derive as much as 50 per cent of their revenues from non-affiliated customers. See Statement of PBW, supra, at p. 3
 
 
 [17]
 Frozen Food Express v. United States, 351 U.S. 40, 44, 76 S.Ct. 569, 100 L.Ed. 910 (1956)
 
 
 [18]
 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)
 
 
 [19]
 The petitioners in Abbott had, at least theoretically, a right to later review of the FDA action in enforcement proceedings. See Vining, Direct Judicial Review and the Doctrine of Ripeness in Administrative Law, 69 Mich.L.Rev. 1445 (1971)
 
 
 [20]
 387 U.S. at 148, 156, 87 S.Ct. 1507
 
 
 [21]
 Id. at 140, 87 S.Ct. at 1511
 
 
 [22]
 Id. at 140 n. 2, 87 S.Ct. 1507. Specifically Justice Harlan cited H.R.Rep.No.1980, 79th Cong., 2d Sess., 41 (1946). See also S.Rep.No.752, 79th Cong., 1st Sess., 26 (1945)
 
 
 [23]
 387 U.S. at 140-141, 87 S.Ct. at 1511. See Rusk v. Cort, 369 U.S. 367, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962); Shaughnessy v. Pedreiro, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868 (1955)
 
 
 [24]
 387 U.S. at 141-146, 87 S.Ct. 1507
 
 
 [25]
 Id. at 156, 87 S.Ct. 1507
 
 
 [26]
 The availability of district court review to petitioners in this case is a question the majority treats as being entirely distinct from that of the availability of review in a court of appeals under section 25(a). (See Maj. Opinion at p. 6, n. 3.)
 
 
 [27]
 In addition, section 10(b) of the APA, 5 U.S.C. Sec. 703, provides that:
 "The form of proceeding for judicial review is the special statutory proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action. . . ."
 
 
 [28]
 See Vining, supra, at 1457
 
 
 [29]
 It is not suggested that section 10(c) of the APA, ex propio vigore, renders any and every "agency action" of the Commission reviewable under section 25(a) of the Exchange Act. But inasmuch as 25(a) is a "statute" providing for review of "agency action" and therefore within contemplation of 10(c), the latter section cannot be deemed to have no effect on the former. See Vining, supra, at 1445 n. 4, 1463-1465
 
 
 [30]
 In Medical Committee for Human Rights v. Securities and Exchange Commission, 139 U.S.App.D.C. 226, 432 F.2d 659, 666 (1970), vacated as moot, 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972), Judge Tamm likewise concluded that the APA and its elucidation in Abbott provided a suitable point of departure for an inquiry into the scope of section 25(a) of the Exchange Act. Cf. Independent Broker-Dealers' Trade Ass'n v. Securities and Exchange Commission, 142 U.S.App.D.C. 384, 442 F.2d 132, 140, cert. denied, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 57 (1971)
 In City of Chicago v. United States, 396 U. S. 162, 164, 90 S.Ct. 309, 24 L.Ed.2d 340 (1969), the Court relied on Abbott as the springboard for an inquiry into the scope of a statutory provision for review of "orders" of the Interstate Commerce Commission.
 
 
 [31]
 This is not to assert that Congress intended, by passage of the APA in 1946, to clarify or modify the intent it had had when enacting the Exchange Act some 12 years earlier. Rather, the APA is properly viewed as a guide to courts faced with the labor of determining the parameters of review jurisdiction generally. The APA establishes, in effect, a rule of judicial decision, by which courts are directed to require a certain quantum of proof before settling upon a restrictive reading of any review provision. The existence vel non of that proof-of evidence of legislative intent-is in no way affected by the strictures of the APA
 This view of the APA's effect on prior enactments is borne out by Abbott. The Food, Drug and Cosmetic Act, considered in that case, was passed several years before passage of the APA. Yet the Supreme Court's approach in construing the previously-enacted statute was dictated, the Court held, by the provisions of the APA.
 
 
 [32]
 The Court has, in other cases, characterized the review provisions of the APA as "broadly remedial." Rusk v. Cort, supra, 369 U.S. at 379, 82 S.Ct. 787, Heikkila v. Barber, 345 U.S. 229, 232, 73 S.Ct. 603, 97 L.Ed. 972 (1953). Section 10 of the APA was, according to the House Judiciary Committee on the APA, "designed to afford a remedy for every legal wrong." H.R.Rep. No.1980, 79th Cong., 2d Sess. (1946) (reprinted in Administrative Procedure Act, Legislative History (G.P.O. ed., 1946))
 
 
 [33]
 See Frankfurter, Some Reflections on the Reading of Statutes, in Essays on Jurisprudence from the Columbia Law Review 43, at 51 (1963)
 
 
 [34]
 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942) (hereinafter "CBS")
 
 
 [35]
 Termed the "Chain Broadcasting Regulations," the regulations effectively prohibited certain exclusive dealing provisions that were customarily written into network-station agreements. See CBS, supra, 316 U.S. at 412, 62 S.Ct. 1194
 
 
 [36]
 Section 402(a), by incorporating the structure of the Urgent Deficiencies Act, provided for district court review of all Federal Communication Commission "orders" except those specified in section 402(b)
 
 
 [37]
 See CBS, supra, 316 U.S. at 416, 418-419, 421, 62 S.Ct. 1194
 
 
 [38]
 Cf. Independent Broker-Dealers' Trade Ass'n v. Securities and Exchange Commission, 142 U.S.App.D.C. 384, 442 F.2d 132, 141, cert. denied, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 57 (1971)
 
 
 [39]
 316 U.S. at 411, 62 S.Ct. at 1197
 
 
 [40]
 Id. at 417, 62 S.Ct. at 1200
 
 
 [41]
 The usefulness of the distinction between agency "rulemaking" and "adjudication" is often overstated. Other courts have agreed. See e. g. City of Chicago v. Federal Power Commission, 147 U.S.App.D.C. 312, 458 F.2d 731, 739 (1971). See also Robinson, The Making of Administrative Policy: Another Look at Rulemaking and Adjudication and Administrative Procedure Reform, 118 U. Pa.L.Rev. 485, 514 (1970)
 
 
 [42]
 316 U.S. at 418-419, 62 S.Ct. at 1201
 
 
 [43]
 Id. at 417, 62 S.Ct. at 1200
 
 
 [44]
 Id. at 416, 62 S.Ct. at 1200. Cf. Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 70-71, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970); City of Chicago v. Federal Power Commission, 147 U.S.App. D.C. 312, 458 F.2d 731 (1971), cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972); National Automatic Laundry and Cleaning Council v. Schultz, 143 U.S.App.D. C. 274, 443 F.2d 689, 698 (1971); Medical Committee for Human Rights v. Securities and Exchange Commission, supra; Phillips v. Securities and Exchange Commission, 171 F.2d 180, 183 (2d Cir. 1948)
 
 
 [45]
 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 910 (1956)
 
 
 [46]
 Id. at 44, 76 S.Ct. at 571
 
 
 [47]
 Id
 
 
 [48]
 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956)
 
 
 [49]
 Id. at 194, 76 S.Ct. 763
 
 
 [50]
 Id. at 199, 76 S.Ct. 763
 
 
 [51]
 Id., 76 S.Ct. at 769. (Emphasis added) Significantly, the Court in Storer characterized the special review provision, despite its literal restriction to "orders," as "legislation allowing review of the Commission's actions." 351 U.S. at 200, 76 S.Ct. at 769. (Emphasis added)
 
 
 [52]
 Columbia Broadcasting System, supra, 316 U.S. at 425, 62 S.Ct. at 1204. See also Shapiro: The Choice of Rulemaking or Adjudication in the Development of Administrative Policy, 78 Harv.L.Rev. 92, 942 (1965)
 
 
 [53]
 15 U.S.C. Sec. 79 x (a). Section 24(a) is practically identical in its terms to section 25(a) of The Exchange Act. It provides as follows:
 "Any person or party aggrieved by an order issued by the Commission under this chapter may obtain a review of such order in the United States court of appeals within any circuit wherein such person resides or has his principal place of business, or in the United States Court of Appeals for the District of Columbia by filing in such court . . . a written petition praying that the order of the Commission be modified or set aside in whole or in part."
 The "Commission" adverted to is, of course, the Securities and Exchange Commission.
 
 
 [54]
 68 App.D.C. 77, 93 F.2d 236 (1937)
 
 
 [55]
 Id. 171 F.2d at 239
 
 
 [56]
 171 F.2d 180 (2d Cir. 1948)
 
 
 [57]
 171 F.2d at 181-182
 
 
 [58]
 Id
 
 
 [59]
 Id. at 183
 
 
 [60]
 82 U.S.App.D.C. 335, 164 F.2d 889 (1947), cert. denied, 333 U.S. 828, 68 S.Ct. 452, 92 L. Ed. 1113 (1948)
 
 
 [61]
 164 F.2d at 893
 
 
 [62]
 Section 19(b) of the Exchange Act of 1934, relied upon by the Commission in this case, likewise empowers the agency to act by either rule or order
 
 
 [63]
 164 F.2d at 900. See Memorandum in Support of the Securities and Exchange Commission's Motion to Dismiss, at 4
 
 
 [64]
 164 F.2d at 899-900
 
 
 [65]
 Loss, Securities Regulation 1140 n. 2 (1951 ed.)
 
 
 [66]
 139 U.S.App.D.C. 226, 432 F.2d 659 (1970), vacated as moot, 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972)
 
 
 [67]
 432 F.2d at 663
 
 
 [68]
 Id. at 666. As discussed at Note 30, supra, the court's point of departure in its application of "general principles" was the presumption of reviewability set forth in Abbott
 
 
 [69]
 Id. at 666
 
 
 [70]
 Id. at 667 (emphasis added), quoting L. Jaffe, Judicial Control of Administrative Action 419 (1965)
 
 
 [71]
 432 F.2d at 667
 
 
 [72]
 See text at Note 52, supra
 
 
 [73]
 Courts have, of course, held some Commission action unreviewable under section 25(a) and under section 24(a) of the Holding Company Act. Analysis of those instances indicates, however, that non-reviewability is found where the Commission's action is merely of a "procedural" nature. See, e. g., Eastern Utilities Associates v. Securities and Exchange Commission, 162 F.2d 385 (1st Cir. 1947); Todd v. Securities and Exchange Commission, 139 F.2d 700 (6th Cir. 1943); Third Avenue Ry. Co. v. Securities and Exchange Commission, 85 F.2d 914 (2d Cir. 1936)
 
 
 [74]
 15 U.S.C. Sec. 78s(b)
 
 
 [75]
 See 78 Cong.Rec. 8087 (5/4/34)
 
 
 [76]
 Id
 
 
 [77]
 See 78 Cong.Rec. 10262 (6/1/34) (statement by House managers). The Senate version of the bill that became the Exchange Act had permitted the Commission to act under section 19(b) only by "order." Id
 
 
 [78]
 78 Cong.Rec. 10266 (6/1/34)
 
 
 [79]
 78 Cong.Rec. 8087 (5/4/34)
 
 
 [80]
 78 Cong.Rec. 10266 (6/1/34)
 
 
 [81]
 The majority also quotes the statement of Representative Wadsworth, a supporter of Fish's proposed amendment. Wadsworth stated that the amendment-substitution of "orders" for "rules or regulations"-would afford reviewability "in case of an extreme ruling" by the Commission. 78 Cong.Rec. 8092 (5/4/34). Assuming Wadsworth was as satisfied with the compromise bill as was Fish, there just is no factual basis for concluding that that satisfaction was grounded in the understanding that "extreme rulings" by "rule" were still unreviewable
 
 
 [82]
 78 Cong.Rec. 8090 (5/4/34)
 
 
 [83]
 78 Cong.Rec. 8091 (5/4/34)
 
 
 [84]
 Id. (Emphasis added)
 
 
 [85]
 See City of Chicago v. Federal Power Commission, 147 U.S.App.D.C. 312, 458 F.2d 731, 739 (1971):
 "In many cases it is unnecessary, and even unwise, to classify a given proceeding as either adjudicatory or rulemaking. The line between the two is frequently a thin one and resolution of a given problem will rarely turn wholly on whether the proceeding is placed in one category or another."
 Cf. Duquesne Light Company v. Environmental Protection Agency, 481 F.2d 1 at p. 5 (3d Cir., 1973).
 See generally Shapiro, The Choice of Rule-making or Adjudication in the Development of Administrative Policy, 78 Harv.L.Rev. 921 (1965).
 
 
 [86]
 Columbia Broadcasting System v. United States, supra, 316 U.S. at 418, 62 S.Ct. 1194
 
 
 [87]
 78 Cong.Rec. 8093 (5/1/34)
 
 
 [88]
 Id
 
 
 [89]
 78 Cong.Rec. 8091 (5/1/34)
 
 
 [90]
 If the Commission's promulgation of Rule 19b-2 is reviewable in the district court under the Administrative Procedure Act (see Abbott Laboratories, supra), a conclusion that that action is also reviewable here under section 25(a) would only serve to expedite the review process. Such expedition, it is submitted, might alleviate somewhat the expressed fears over "tying up" Commission action in the courts. See the remarks of Representative Lea, 78 Cong.Rec. 8090 (5/1/34), and of Representative Rayburn, 78 Cong.Rec. 8093 (5/1/34), quoted supra. At least one member of Congress has recognized that special statutory review provisions such as section 25(a) were generally intended to "save time." See Administrative Procedure Act: Legislative History 388 (remarks of Representative Bennett in the House, May 24, 1946) (G.P.O. ed., 1946)
 
 
 [91]
 Hearing on S.Res. 84, S.Res. 56, and S. Res. 97 before the Senate Committee on Banking and Currency, 72d Cong., 2d Sess., and 73d Cong., 1st and 2d Sess. (1934) at 7569. (Emphasis added)
 
 
 [92]
 Id. at 7571. (Emphasis added)
 
 
 [93]
 Hearings on S. 1164 and S. 3347 before the Senate Subcommittee on Securities of the Committee on Banking, Housing and Urban Affairs, 92d Cong., 2d Sess. (1972), pp. 287-290
 
 
 [94]
 Id. at 288. (Emphasis added)
 
 
 [95]
 Id. at 290
 
 
 [96]
 Columbia Broadcasting System, Inc. v. United States, supra, 316 U.S. at 418, 62 S. Ct. at 1201
 
 
 [97]
 See United States v. Storer Broadcasting Company, supra, 351 U.S. at 199, 76 S.Ct. 763
 
 
 [98]
 See Columbia Broadcasting System v. United States, supra, 316 U.S. at 416, 62 S. Ct. 194; Phillips v. Securities and Exchange Commission, supra, 171 F.2d at 182; Philadelphia Co. v. Securities and Exchange Commission, supra, 164 F.2d at 899
 
 
 [99]
 Guiseppi v. Walling, 144 F.2d 608, 624 (2d Cir. 1944) (L. Hand, J., concurring)
 
 
 [100]
 Cf. Bohlen v. Weinberger, 483 F.2d 918, at 923 (3d Cir., 1973) (Aldisert, J., dissenting)
 
 
 [101]
 Llewellyn, Jurisprudence: Realism in Theory and Practice 30 (1962)
 
 
 [102]
 See Jaffe, Judicial Control of Administrative Action 346, 357 (1965). Cf. National Automatic Laundry and Cleaning Council v. Schultz, supra, 143 U.S.App.D.C. 274, 443 F.2d at 696
 
 
 [104]
 American Sumatra Tobacco Co. v. Securities and Exchange Commission, 93 F.2d 236, 241 (1937). See also Medical Committee for Human Rights v. Securities and Exchange Commission, supra, 432 F.2d at 672